## SULLIVAN *v.* McLENANS.

Where land is purchased by one, with money furnished by another, a constructive trust arises, the former being a trustee for the latter.

In this country, we must look to the government and its grants, for the source of all title.

Where one co-tenant purchases in an incumbrance or adverse title, he is ordinarily held to do so, for all the co-tenants; but this doctrine does not apply to the case of co-occupants of the lands of the general government, where one shall have acquired title from the United States, in the absence of fraud, or special contract.

A tenancy in common can only be destroyed, either by uniting all the titles and interest in one tenant—thus bringing all the interests into one severalty; or by partition—giving all respective severalties.

A promise to pay more than ten per cent. interest, under the statute of 1843, is without consideration, and void.

Parol evidence will not be received to vary or contradict that which is evidenced by writing, and this doctrine applies in equity, as well as at law.

While an advance of money, may create a resulting trust, it must be subject to the rights of others, and cannot be allowed to intervene to defeat prior and superior equities.

## *Appeal from the Dubuque District Court.*

BILL in chancery to settle the title to certain real estate. The facts, as we derive them from the pleadings and testimony, are, in substance, as follows: The land in dispute contains some 13.10 acres, and is situated near the city of Dubuque, on what is called the "Mineral Reserve." It appears that this so-called "reserve," was withheld from sale by the general government, until the year 1847, because of a claim made thereto by the heirs of Julien Dubuque, under an Indian grant. Previous to this time, however, a large number of persons had settled and made "claims" upon the reservation. Most of the "claims" appear to have been made for mining purposes, and without any regard to the government lines. The consequence was, that in many instances, several claimants were located, in whole or in part, on one, and some on several, legal subdivisions.

By virtue of the act of Congress, approved July 11, 1846,

(Statutes U. S. at large, Vol. IX, 37), these lands were brought into market in March, 1847. The settlers, having in view the irregular shape of their "claims," and the difficulties growing out of conflicting lines and interests, in the fall of 1846, framed an association or combination, for the purpose of securing their lands. It was agreed by these articles of association, that there should be a public bidder, in whose name all the land should be purchased, unless the claimants of any particular subdivision, should agree upon some other form. A map was to be made of this mineral district, and the extent of each claim, and its owner, were to be marked thereon, as the same were settled and determined by the "claim committee." The public bidder, or the person so purchasing for the claimants, was, "immediately after such sale, to convey said lands to the persons respectively entitled to the same"—the persons, in all cases, furnishing the money to purchase the lands thus to be bid off for them, and paying the expenses of the conveyance. This association adopted a constitution or articles of agreement, and every claimant wishing to avail himself of its protection, was required to sign the same. It was signed by some seven hundred and fifty claimants, including the complainant, and by Sanford and Smith, agents and attorneys for Jane Mc-Lenan (widow), John, William, Bernard, and Margaret McLenan, heirs of B. McLenan, deceased. It also appears, that as early as 1836, one White made a claim on this reserve, containing, as far as now appears, about 72.53 acres. It is known as mineral lot No. 173, is of very irregular shape, and situated in four different sections, to wit: in sections 23, 24, 25, and 26, town 89, range 2, east. A part of this claim, containing 13.11 acres, extends on to the southwest of the southeast quarter of section 23, and is the land now in dispute. White sold to Coleman, and Coleman to O'Farrel and B. McLenan (the father of the respondents). O'Farrel afterwards sold his interest (being an undivided half), to one Tierman, and this interest was afterward, to wit: December 7, 1846, sold to said O'Farrel and the complainant. In February afterwards, O'Farrel sold one-half of his interest

(being an undivided eighth), to one Pentecost, and at the land sales, it appears that the remaining interest of O'Farrel, was in one Levins. The map made as aforesaid, shows that the lot 173 was marked by the claim committee, as belonging, one-half to McLenans' heirs, one-fourth to complainant, and one-fourth to Levins and Pentecost, beside some one or two acres to other persons, not necessary to here name. All of this lot was entered in the name of the public bidder, George L. Nightingale, except this 13.11 acres, which were entered by John G. Shields.

The McLenans are non-residents, and as far as shown by the proof, have never resided on the land in controversy, or in the state. About the time the land was sold, in March, 1847, one of the McLenans was at Dubuque, and there made an arrangement and agreement with complainant, as respondents allege, by which he (complainant) was to see to paying respondents' portion that might be due for entering the lot, and to protect their rights in relation thereto. At the same time, complainant borrowed of the said McLenan, four hundred dollars, for which he gave him his note, due in one year, with ten per cent., secured by a mortgage on certain real estate of complainant; and respondents allege, that this verbal agreement as to the entry of the land, grew out of the same mortgage transaction, and that any money advanced by complainant to secure the McLenan interest, was afterwards to be paid. This agreement is sworn to by two witnesses. It appears that this mortgage was afterwards foreclosed, and the whole amount, with interest, paid, without any deduction or claim of offset, or payment, for money so advanced.

Some time after the land sales, it appears that complainant applied to Nightingale, for a deed for three-fourths of this lot, claiming that he owned that interest. Nightingale refused to so deed, for the reason that complainant's interest was one-fourth, and not three-fourths. Complainant thereupon filed his bill in chancery against Nightingale, praying that he be decreed to make this conveyance. To this bill, the McLenans were made a party; but were never served,

however, and did not appear; and as to them, the complainant dismissed his bill. Nightingale having made default, a decree was rendered, requiring him to convey to complainant, an undivided three-fourths of said lot 173,— which conveyance he afterwards made, including the 13.10 acres in dispute. It is evident that the McLenans never advanced any money, to pay for the entry of their interest in this lot, unless complainant is regarded as their agent, in the advances made by him. While the testimony is not entirely conclusive, yet the burden of proof is, that complainant advanced three-fourths of the purchase money to the public bidder, and the different collectors.

In an early day, there was some improvement on the " claim," but for four or five years before the land sales, this improvement had been abandoned ; but the claim was reputed and known as belonging to McLenan and others. After the land sales, and after complainant had, as was supposed, the legal title to three-fourths, and Levins a like title to one-fourth, they made an agreed partition—Levins taking about 18 acres on the east side of the lot, and complainant all the other part, containing some 54.40 acres, including the tract in dispute, and conveyed to each other accordingly. Complainant has, since the land sales, been in possession of the premises, has laid out a town on a part of the same, and the property has greatly appreciated in value. The McLenans have paid no taxes ; the complainant has ; but whether all that have been assessed, is not shown. At the time of the land sales, one of the McLenans' heirs was of age—the other two, minors ; one of them arriving at majority in 1849, and the other in 1854. After the land sales, they had agents in this state for the payment of taxes, but for no other purpose. In May, 1854, one of the McLenans' heirs, visited Dubuque, for the purpose of seeing to the interest of said estate. Upon examination, it was found that the 13.10 acres in controversy, was entered by Shields, and not by Nightingale, and that the title thereto was still in Shields. At the request of said heirs, Shields then conveyed to them an undivided half of the same, and to Levins an undivided

fourth—reciting the entry by him at the public land sales in 1847, in trust for the persons entitled thereto, and the receipt of the purchase money from the McLenans' heirs and Levins. Shields, as well as his grantees, knew of the claim made by complainant to the tract. In October afterwards, Sullivan files the bill in this case, making Shields, Nightingale, John, William, and Margaret McLenan, and Levins, parties—seeking to set aside the conveyance to McLenan and Levins, and claiming to have the equitable, and to be invested with the legal, title. In the court below, his bill was dismissed, and he now appeals.

*Smith, McKinlay & Poor*, and *Wiltse & Blatchley*, for the appellant.

*Samuels & Cooley*, for the appellee.

WRIGHT, C. J.—It will be observed, that the legal title to this property is in the respondents, McLenans and Levins, and complainant seeks to divert it. It is also evident, and not controverted, that when the conveyances were made by Shields, he and his grantees had notice that Sullivan claimed to own all the land, and denied the equitable right of any person else therein. We shall, therefore, treat the case, as if these conveyances had never been made by Shields; and as if he still held the legal title, in trust for the person entitled thereto; for as his grantees purchased with notice of his trust relation, they can take no better title than he had, and must be treated as trustees, holding the legal estate as Shields did. Let us suppose, then, that the legal title was still in Shields, and that Sullivan had filed this bill against him, and the other respondents, asking that Shields should convey to him all of the 13.10 acres, instead of one-fourth or one-half. Under the proof here made, would he be entitled to relief? And while the case is by no means free from doubt, yet we incline to answer this question in the negative, and shall so hold.

The case has been most fully and elaborately argued, and

various questions of fact, as well as law, have been ably presented. As to the legal propositions involved, we think there is not much room for controversy, they being, for the most part, plain and well settled. For instance, as a general rule, where land is purchased by one, with money furnished by another, a constructive trust arises, the former being a trustee for the latter. So, also, it is true, that in this country, we must look to the government and its grants, for the source of all title. And, again, where one co-tenant purchases in an incumbrance or adverse title, he is ordinarily held to do so for all the co-tenants; but we hardly think, this doctrine would apply to the case of co-occupants of the lands of the general government, where one shall have acquired title from the United States, in the absence of fraud or special contract. And so, also, a tenancy in common can only be destroyed, either by uniting all the titles and interests in one tenant, thus bringing all the interests into one severalty, or by partition, giving all respective severalties. And, again, a promise to pay more than ten per cent. interest, under the statute of 1843, would be without consideration, and void. Neither can there be any doubt, as to the well settled and salutary doctrine, that parol evidence will not be received to vary, or contradict, that which is evidenced by writing ; and that this applies in equity, as well as law.

These, and other propositions, maintained on either side of this case by counsel, are well understood, and generally conceded. The only question there can be, is as to their applicability, and this leads us to the facts; and here, again, there is scarcely room for controversy. At the time this land was sold, it is very evident that complainant's interest in the claim, was one-fourth. It is also clearly proved, that the father of the McLenan heirs did purchase one-half of the claim, and that so far as this purchase could give any right, it was held and retained until the land was sold by the United States. The other fourth was held by Pentecost and Levins. That Sullivan was aware of these respective interests and claims, is abundantly established. Indeed, he

Sullivan v. McLenans.

does not in his pleadings, claim to have owned more than one-fourth of the claim before the land sales, and this he purchased in December, 1846, his deed reciting the interest of McLenan (one-half) to the same claim. The map of the mineral district shows their respective interests, and the articles of agreement show that McLenan, as well as Sullivan, had *some* interest or claim on the reserve.

But the complainant, while conceding all this, treats the claim title as void—as evidence of nothing, relying alone upon the government title, and the equities arising since the purchase; and to us it appears, that this very claim is fatal to his prayer for relief. Upon what ground is it, that he claims that Shields was his trustee, in purchasing the land? For whom did Shields become trustee, when he made this purchase? By virtue of what arrangement and agreement, did he occupy the trustee relation? To whom was he to make conveyances, in execution of his trust? The answer is found to all these questions, in this agreement or constitution made by the settlers, and nowhere else. By these articles, or this constitution, the bidder or purchaser was to convey "*said lands to the persons respectively entitled to the same.*" If the bidder or purchaser was not bound to convey to such persons—if he was not bound by this constitution or articles of association—then he was under no legal or equitable obligation to convey to any one; nor under any obligations of any kind, to any person, touching such lands so to be entered. And, therefore, unless complainant was one of these settlers, and entitled to the interest claimed in this land (or in the claim before its entry), he has no more right to call upon the purchaser to convey to him, than has an entire stranger to the transaction. Shields did not enter this land for any person that might ask it of him, any more than he entered it for himself. Neither should he be compelled to convey to any person, who may file his bill in equity, without establishing that he was a "claimant," and as such entitled to the land, and an execution of the trust. To our minds it is conclusively clear, that Sullivan, at the time this land was entered, had no interest

therein, beyond an undivided fourth; and to that extent alone, did Shields become his trustee. He seeks to increase that interest, and to draw to himself the legal title to the whole tract, and in this, we think, his proof fails him.

But it is said, again, that this claim or settlers' association, was contrary to the laws of the United States, and the policy of the government in the sales of her public lands, and, therefore, could confer no rights, nor yet create any equitable interests, in the McLenans. If this was granted to its fullest extent, it would certainly not aid complainant. It is by virtue of these very articles, that Shields became his trustee, or he never did. If they are void, and the settlers thereunder have no right to compel an execution of the trust; then complainant must fail, and the title must remain in Shields. And here, it is well to bear in mind, that it is complainant that is seeking to establish an equitable right to this land, and that the burden of proof is upon him; and that, unless he establishes such paramount right, he must fail, whatever may be the respective rights of the other parties. We, then, do not discuss the validity of these claim associations, regarding such discussion neither necessary or profitable to either party. It is further claimed, however, that complainant furnished the purchase money, and that a resulting trust was thereby created in his favor, as the owner of the money. The general rule upon this subject, we have before stated, and need not now repeat. And in disposing of this point, we may say at once, that we give but little, if any, weight to the verbal agreement set up and claimed by McLenans, in connection with the mortgage transaction; and did the case depend alone upon enforcing that agreement, we should probably find for complainant. Aside from every legal objection to the proof, the transaction as claimed, is so unwarrantable, and so clearly repugnant to the undenied conduct of the parties at the time, and the known experience and business habits of men, that we should hesitate before making it the basis of either granting or refusing relief to either party. But, aside from this, let us examine the complainant's claim to this land, based upon the advance

of the purchase money. It does not follow, that because money may have been furnished by one party for the entry of land, that a trust thereby results, that cannot be explained or defeated. The general rule is as stated; but to this there may be, and are, exceptions. Let us take the very transaction now before us. Suppose Nightingale, the public bidder, had received money from a person who was a stranger to this entire tract of land; one who never had a claim thereon—who never became a party to the association, and who was never recognized as entitled to an interest therein by any committee or otherwise—and gave him a receipt showing that it was on a particular tract. After the purchase, Nightingale refuses to convey, it being evident that another person, than he who has advanced the money, is entitled to a conveyance, and that this was known to all parties at the time. Could this stranger compel him to convey, because he had advanced the purchase money, when the public bidder's undertaking, and his trust relation, required him to "obtain title," and convey the lands, to those to whom they "rightfully belong?" Most clearly not. It is very evident, that in this transaction, the claimant, in order to compel the execution of the trust, must not only advance the purchase money, but also be entitled as a claimant to the land; and no one could, by such advance alone, change the relation that existed between the purchaser and any other claimant—in the least prejudice the rights of such other person—or create a resulting trust that would defeat any previous known express trust. So that, while an advance of money may create a resulting trust, it must be subject to the rights of others, and cannot be allowed to intervene to defeat prior and superior equities. Complainant then, as before stated, at the land sales, had no right to more than one-fourth of this tract. To this extent, he was entitled, and no more. Thus far, and no further, did Shields become his agent or trustee. For the remaining portion, he became a trustee for others, and that with the knowledge of the complainant; and he could not increase his interest, nor decrease the rights of others, by advancing this money. If the ad-

vance was voluntary, it cannot help his claim; if for, and at the request of, the McLenans, then, of course, they must reap the benefit.

And, again, it is claimed, that when the patent for the land was issued by the government, all rights of the settlers, existing prior to that time, were cut off, and that the holder of the patent, took the land unincumbered by any squatter or claim lien or right. But how does this help complainant's case? He never has had a patent or title for this land, from any person authorized to convey, or having any interest to sell (except that from Levins, to which we shall refer), and he has, therefore, no such title, to be prejudiced by the claim or equity of the settler. It is the respondents who have the title, and that he seeks to divest, instead of his having title, and they claiming the execution of a trust.

If this conveyance had been made by Shields to complainant, recently after the land sales, and the McLenans were now setting up a claim to the one-half, based upon a prior "claim title"—the alleged agreement of March, 1847—and all the other circumstances disclosed, we might not feel inclined to disturb the title. There are many circumstances strongly tending to rebut such claim of the McLenans. Here, however, we have it clear, that McLenans did own one-half, and complainant one-fourth. A deed was never made by the trustee until 1854, and that to the party that appears to have been entitled to it. Complainant now seeks to set this aside. To do so, he should show that Shields was his trustee for the land claimed. This he has not shown, and must, therefore, fail; for though the McLenans had no equity in their defence, complainant cannot ask Shields to convey that, to which he shows no right by the agreement and contract under which the land was entered, or in any other manner.

We, therefore, think the decree was right as to the McLenans. We do not think, however, that the bill should have been dismissed. It appears, that so far as Levins is concerned, he sold his interest in this land to complainant, or in other words, they made an amicable partition of their inter-

ests therein. Notwithstanding this, Levins procured afterwards, a conveyance from Shields, for one-fourth of this land. This he has no right to, and the decree should have been for complainant as to this interest. He is clearly entitled, by virtue of his original or claim right, and his purchase from Levins, to one-half of this tract of 13.10 acres, and to that extent, the decree should have been in his favor.

With this modification, the decree will be affirmed.