**Ruby STRONG, Appellant,**

v.

**Naomi Strong WOOD and Carol Strong Shimon, as Administrators of the Estate of P. L. Strong, deceased, Dean L. Strong, Naomi Strong Wood and Carol Strong Shimon, Appellees.**

**No. 65333.**

Supreme Court of Iowa.

June 17, 1981.

Charles A. Gunderson, Rolfe, for appellant.

J. Desmond Crotty, of Crotty & Fitzgerald, Pocahontas, for appellees.

Considered by REYNOLDSON, C. J., and UHLENHOPP, HARRIS, ALLBEE, and LARSON, JJ.

LARSON, Justice.

Sometime in 1976 Philander L. ("Mike") Strong and the plaintiff, then Ruby Esterley, became acquainted. At that time Mike was a 76-year-old farmer who had lived by himself in rural Pocahontas County since the death of his wife Velma in 1968; Ruby was a 66-year-old widow living in Minneapolis, Minnesota. Their relationship progressed to the point where Mike proposed to her in October, 1976; Ruby, however, did not "make up her mind" to marry him until December, 1976.

In late November and early December, 1976, Mike vacationed in Hawaii. When he returned to Iowa before the Christmas holi-

days he wrote to Ruby saying that he was "looking forward to the day we are going to be married. I can't wait much longer . . . . I'll be glad when we can live together all the time." During this period, Mike contacted the defendants, children from the marriage to his deceased wife, requesting that they meet at the office of his attorney, R. L. Hudson, over the upcoming holidays. The purpose of the meeting was not disclosed, and the children did not question their father on the matter.

On December 29, the family met at Hudson's office in Pocahontas where, according to Hudson, the following conversation took place:

I said, "Mike, what can I do for you?" And he said, "Well, the children were all home, and I've been reading about this new revenue act," and he said, "I thought I better—we better come in and I better find out what to do to save myself taxes."

\*   \*   \*   \*   \*   \*

I think I told him that, well, I know I did, that anything that was done, would have to be done on or before December 31, because the new law became effective January 1.

\*   \*   \*   \*   \*   \*

Q. Did he eventually, then, on that day, direct you to draft a deed conveying the—

A. Well, after discuss[ing] it back and forth, he said—he said this: He said, "Well, I think I better deed the land and whatever there is could be some there is going to be some change in the rules." He said, "I think I better do that," and he instructed me to do it.

\*   \*   \*   \*   \*   \*

Mike said that the children are all home the 29th or just a few days after Christmas, and Dean was here, and he wanted to come over and talk about it—his estate. And thought something was necessary to be done, because of what was going to happen under the new law. After some discussion between Mike and his attorney, it was agreed that Hudson would draw up a warranty deed which, after re-serving to Mike a life estate, would transfer Mike's interest in an 80-acre farm to his three children in return for "$1.00 and other consideration." Mike did not indicate to the others at this conference that he was considering marriage, and in fact, they testified they did not know of Mike's relationship with Ruby. The deed which Hudson executed was recorded on the same day, December 29.

On January 26, 1977, nearly one month after this meeting in Hudson's office, Mike and Ruby were married, without prior notice to their children. Retiring to the 80-acre farm, the couple lived there until Mike died, intestate, on December 3, 1978.

This action in equity was commenced by Ruby against Mike's children, Naomi Strong Wood and Carol Strong Shimon, as administrators of Mike's estate, and against these same defendants and Dean L. Strong as individual grantees of Mike's interest in the farm. She alleged that she had entered into an oral contract of marriage with Mike prior to December 29, 1976; that she had not been aware of the transfer of the farm to his children prior to the marriage; that only after his death did she learn of the conveyance; and that as a result of her reliance on a statement by Mike that "she would be well provided for, both before and after his death," the transfer of the farm to his children fraudulently deprived her of her marital interest, § 633.211(1), The Code 1977. She requested that the deed be cancelled and annulled, and that she be granted her one-third share in the farm under the provisions of chapter 633. The matter was tried to the district court which found that Ruby failed to prove (1) that she relied on any representation as an inducement to marry and (2) that Mike intended to deceive or defraud her. Accordingly, the court entered judgment in favor of the defendants, from which Ruby now appeals.

We have reviewed the record de novo since the action was tried to the district court sitting in equity. See Iowa R.App.P. 4.

*I. Elements of Claim.* The parties do not dispute whether the plaintiff may bring an action for fraudulent or secret conveyances in contemplation of marriage; rather, they dispute the elements required to be proven for recovery under such a claim. Our earlier cases involving such claims have not been consistent in defining the elements of recovery or the applicable presumptions. *See e. g. In re Estate of Mann*, 201 Iowa 878, 208 N.W. 310 (1926) (conveyance four months prior to marriage but during period of engagement; plaintiff required to show (1) existing contract of marriage at time of conveyance and (2) no knowledge of conveyance prior to marriage); *Bell v. Dufer*, 142 Iowa 701, 121 N.W. 500 (1909) (conveyance nine days prior to marriage but during "two month courtship"; plaintiff required to show (1) want of knowledge of the conveyance, and (2) reliance on her prospective rights in the property); *Wallace v. Wallace*, 137 Iowa 169, 114 N.W. 913 (1908) (conveyance two days prior to marriage; defendant conceded deed executed in contemplation of marriage without plaintiff's actual knowledge; recovery for plaintiff since "[i]t is well settled that a secret conveyance in contemplation of marriage is fraudulent as to the spouse, the intent to deprive her of the marital rights which she would otherwise have acquired being *presumed* from the circumstances") (emphasis added); *Beechley v. Beechley*, 134 Iowa 75, 108 N.W. 762 (1906) (conveyance eight months prior to offer of matrimony; "[f]raudulent intent will *not* be presumed"; judgment for plaintiff reversed) (emphasis added). *See generally* D. McCarthy, *Iowa Probate* § 1665, at 454–56 (1965); 4 G. Thompson, *Real Property* § 1917, at 121–37 (1961).

This conflict in authority is not limited to cases within our own jurisdiction. One authority has noted:

> There has been some conflict of authority over the fraudulent character of a voluntary conveyance of property by one engaged to marry where the conveyance is merely not revealed, no resort being made to any active expedient to mislead or keep the intended spouse ignorant with respect to the conveyance. One

view is that the conveyance is actually fraudulent; at least, if by a woman it is actually fraudulent against the common-law marital rights of her intended husband. That view has likewise been followed with respect to a secret antenuptial conveyance by a husband, regarding it as actually or at least constructively fraudulent. Another view is that such a conveyance, though prima facie good, must be judged by its own particular surroundings, purposeful concealment, however, being evidence of purposeful fraud. Still a different view is that such a conveyance is prima facie fraudulent, but the parties holding thereunder may show that no fraud was intended or practiced on the party complaining. Again, it has been said simply that the mere failure of a grantor to inform his intended wife of a conveyance by him just before marriage is not of itself sufficient to make it fraudulent against her.

41 Am.Jur.2d *Husband and Wife* § 198, at 174 (1968) (footnote omitted).

██ Upon analysis of the various authorities we conclude the establishment of such a claim should turn on proof of the following elements: (1) a transfer made during a contract to marry or under such other circumstances, including its proximity to the marriage, indicating it was made in contemplation of marriage; (2) lack of adequate consideration for the transfer; (3) lack of knowledge of the transfer on the part of the prospective spouse; (4) fraudulent intent on the part of the transferor and (5) reliance by the prospective spouse upon the transferor's interest in the transferred property as an inducement to marriage. Proof of fraudulent intent understandably raises troublesome evidentiary problems, especially where, as here, the transferor is deceased. We believe the preferable rule is that which creates a presumption of fraudulent intent on the part of the transferor upon establishment of the first three elements, *i. e.*, a transfer during the contract to marry or in contemplation of marriage, a lack of adequate consideration, and a lack of knowledge on the part of the prospective

spouse. The burden of overcoming such presumption would be upon the proponents of the transfer to show a lack of such fraudulent intent. *See* 41 Am.Jur.2d, *supra* § 198, at 174.

■■■ *II. Application of the principles to this case.* Despite the existence of some evidence tending to show Mike's intent to defraud Ruby, including his failure to reveal the transfer prior to marriage and its proximity in time to the marriage, the existence of an engagement or contract of marriage at the time of the transfer was not established. Although Ruby testified she "made up her mind" in December, 1976, to accept Mike's marriage proposal there was no evidence that this decision had been conveyed to Mike. Whether the proximity of the transfer to the actual marriage is sufficient, alone, to establish that it was made in contemplation of marriage presents a difficult question. However, it need not be decided in this case; nor is it necessary to decide whether, if the presumption of fraudulent intent was thus established, the proponents' estate-planning explanation was sufficient to rebut the presumption. We do not reach these issues because, even assuming the existence of a fraudulent intent, Ruby's claim suffers from another failure of proof: there is no showing that she relied on her prospective property rights as an inducement to marriage. In regard to her reliance, Ruby was asked this question[1]: "Prior to Christmas of 1976, did you know about Mr. Strong's farm?" She replied: "Just that [he] said it was his farm, and—I mean we never really discussed it, except that he said that he had a farm." There was no evidence that Ruby was induced to marry Mike by his ownership of the land nor that she was even informed as to any details of Mike's interest, whether he was full or part owner, what equity he had in it, the size of the farm, or even its approximate value. Fraudulent intent alone is insufficient to establish a claimant's

rights in the transferred property; it is the fraudulent *effect* of the transferors actions which we must consider. A complaining spouse cannot claim such effect if no reliance is shown. *See Bell v. Dufur*, 142 Iowa 701, 703, 121 N.W. 500 (1926), 41 C.J.S. *supra* § 20, at 420.

We conclude the district court properly denied Ruby's claim.

AFFIRMED.

---

1. At trial the defendants argued that the "deadman's statute," § 622.4, The Code 1975, prohibited the introduction of the plaintiff's testimony regarding her conversations about marriage with her husband, the deceased. Although they raise this same issue on appeal, we do not reach it because we conclude the plaintiff has failed to carry her burden of proof, even assuming its admissibility.