Clifton G. MOSER and Carlys C. Moser, Appellees,

v.

THORP SALES CORPORATION, Thorp Credit, Inc., Hoth and Willman Real Estate and Auctions, Col. Chuck Hoth, Col. Gay Oelke, Marguerite Schmitt, Richard Schmitt, Thorp Finance Corp. of Wisconsin, and ITT Thorp Corp., Defendants,

Lola Jean Woods and Donald J. Woods, Appellants,

The Federal Land Bank of Omaha, Appellee,

and

Gary Woods, Intervenor.

No. 61995.

Supreme Court of Iowa.

Nov. 25, 1981.

Frederick G. White, Waterloo, and Larry F. Woods, Oelwein, for appellants and intervenor.

Kathleen Neylan and Kevin C. Neylan, Elkader, for appellees Moser.

John Gnagy of Erhardt and Gnagy, Elkader, for appellee Federal Land Bank.

McGIVERIN, Justice.

This is another chapter in a saga of litigation and clouded title to a 285-acre Clayton County farm that began in 1971. The facts of the first appeal appear in *Moser v. Thorp Sales Corp.*, 256 N.W.2d 900 (Iowa 1977) (*Moser I*) and are detailed below only as necessary to understand subsequent developments. In the issues now before us, the district court granted summary judgment quieting title to the land in plaintiffs Clifton G. Moser and Carlys C. Moser. After trial, the court awarded them damages against defendants Marguerite and Richard Schmitt and Lola Jean and Donald J. Woods and dismissed Woods' counterclaim for reimbursement for improvements to the land and buildings. Woods appeal. Mosers and defendant The Federal Land Bank of Omaha cross-appeal. We modify, affirm as modified, and remand.

Mosers purchased the land from Schmitts for $42,180 at an auction on December 1, 1971, and the parties then signed a contract of sale. Mosers paid $8430 down and the transaction was to be closed on January 15, 1972. Schmitts refused to perform and defendant Thorp Finance Corp. of Wisconsin foreclosed a mortgage it held on the land. In 1973 Mosers brought an action for specific performance, quiet title and damages, which resulted in the appeal in *Moser I.* However, Woods were not parties to that litigation. Other evidence before the court

in *Moser I* indicated Woods may have later purchased the land from Schmitts or else had become the assignees of defendant ITT Thorp Corp., purchaser of the farm at the foreclosure sale.

In *Moser I* we remanded to the district court for further proceedings. 256 N.W.2d at 912-13. Thereafter, Mosers amended their petition to add Donald J. Woods and his wife, Lola Jean Woods, (Woods), as defendants to the quiet title division. Mosers also amended their petition to add The Federal Land Bank of Omaha (FLB), a mortgagee of Woods, as a defendant in the quiet title division. Woods' son, Gary D. Woods, who had farmed the land with his father in 1977, intervened. Appropriate responsive pleadings were filed.

Mosers moved for partial summary judgment on March 10, 1978, asking that the court quiet title in them as against all defendants.

Woods counterclaimed for improvements made on the land in the event the court quieted title in Mosers.

The court entered its judgment and decree on the motion for partial summary judgment on April 10. The court concluded that neither Woods nor FLB were good faith purchasers for value without notice, since the parties had received actual notice of Mosers' prior claims to the real property. Title to the property was quieted in Mosers against all named defendants in the action.

On April 14 depositions, taken on behalf of Woods on April 5, were filed but not considered by the court in ruling on summary judgment. Woods moved to vacate and set aside the judgment and decree. The court overruled the motion. Woods and Schmitts filed notices of appeal. We stayed those appeals until all remaining issues had been ruled on by the trial court.

A second judgment was entered by the trial court on September 20, 1978. This judgment was based on a hearing limited to an adjustment of rents, profits and damages between Mosers and Schmitts, and a consideration of the final report of a receiver, who had been appointed to administer the land.

The court ordered the clerk to return $8430 to Mosers, which sum represented the down payment on the 1971 sales contract that was the basis of Mosers' claim to the land. The court also entered judgment for Mosers against Schmitts for $22,199.69 plus interest for: interest on Mosers' down payment; the difference between the equitable redemption amount of $45,479.14 paid into court by Mosers to fulfill a condition allowed by our remand in *Moser I*, 256 N.W.2d at 912, and the original purchase price plus interest from April 10, 1978, until date of judgment; and net rents plus interest for the years 1972, 1973, and 1974 when Schmitts were in possession of the land.

Mosers filed notice of appeal from portions of the September 20 judgment. We also stayed that appeal pending resolution of other issues.

On February 22, 1979, Mosers filed an application for authority to file supplemental pleadings. Over Woods' resistance, the trial court granted Mosers leave to file such pleadings. The court also ordered the case to be tried as a nonjury matter and classified all pending matters as equitable issues.

The supplemental pleadings filed by Mosers asked for an accounting from Woods for lost rents and profits, for damages to the buildings and land while Woods were in possession during 1975–77, and for general equitable relief. Woods answered and made demand for jury trial of the issues raised by the supplemental pleadings and their own counterclaim.

After trial to the court on the remaining issues, judgment and decree were entered on August 2, 1979. The decree reiterated the judgment for Mosers against Schmitts and the quieted title in Mosers as against all defendants. The decree also approved the receiver's report. The court awarded the 1977 corn crop to Woods and the intervenor and dismissed Woods' counterclaim. It entered judgment in favor of Mosers against Woods for $51,065.51 with interest, less credit for real estate taxes paid by Woods. This sum comprised the rental value, plus interest, for the crop years 1975,

1976, and 1977 and the value of straw removed from the farm by Woods. Due to the pending appeals, no ruling was made as to ownership of the $45,479.14 paid into court by Mosers in response to our opinion in *Moser I. See* 256 N.W.2d at 912. Mosers, Woods, and FLB each claimed this fund.

Woods appealed and Mosers and FLB cross-appealed. Gary Woods joins with Lola Jean and Donald J. Woods as to the 1977 corn crop issue. The other parties are not participating in this appeal.

The judgment of August 2, 1979, was not final as it did not dispose of all issues in the case. However, to expedite this prolonged litigation, we will grant an interlocutory appeal as to the issues properly preserved and raised before us. Iowa R.App.P. 1(c), 2(a). *State ex rel. Parcel v. St. John,* 308 N.W.2d 8, 9–10 (Iowa 1981).

We will consider the following issues:
1. Were Woods good faith purchasers of the land for value without notice?
2. Was the summary judgment quieting title in Mosers appropriate?
3. Were Woods entitled to recover damages for improvements as occupying claimants?
4. Was it proper to allow Mosers to file supplemental pleadings?
5. Were Woods entitled to a jury trial?
6. Who has priority to the $45,479.14 fund Mosers deposited with the Clayton County Clerk of Court pursuant to our directions in *Moser I*?
7. Were Mosers entitled to recover for damages to the land and buildings for the time while Schmitts and Woods were in possession?
8. Who is entitled to possess the crops raised by Woods?
9. Were the rent awards to Mosers properly calculated?
10. Are Woods entitled to a setoff for real estate taxes paid while in possession?

■ Actions for quiet title lie in equity. § 649.6, The Code 1981. As such, our review is de novo. Iowa R.App.P. 4, 14(f)(7). In addition, when an action is tried to the district court in equity, we review the record de novo. *Strong v. Wood,* 306 N.W.2d 737, 738 (Iowa 1981). The present appeal was tried in equity and generally we would review the record de novo. However, even in an equity case we cannot find facts de novo in an appeal from summary judgment. *Lyon v. Willie,* 288 N.W.2d 884, 894 (Iowa 1980). Therefore, on the issues adjudicated by the trial court in its partial summary judgment of April 10, 1978, we review for correction of errors at law. Iowa R.App.P. 4. The only issue finally adjudicated by the partial summary judgment was the quiet title issue, with title quieted in Mosers because Woods were found not to be good faith purchasers for value without notice.

■ I. *Status of Woods as bona fide purchasers.* Woods assign as error the trial court's summary judgment that they were not good faith purchasers for value without notice. We find no error. "The rule is well established that to be a good faith purchaser for value, one must show that he made the purchase before he had notice of the claim of another, express or implied." *Janssen v. North Iowa Conference Pensions Inc. of Methodist Church,* 166 N.W.2d 901, 908 (Iowa 1969). Because of the actual, imputed and constructive notice Woods received before their purchase from Schmitts on March 24, 1975, we agree with the court that, as a matter of law, a genuine issue of material fact does not exist on the issue of Woods' lack of notice of Mosers' claims and therefore Woods are not bona fide purchasers.

■ A. *Notice from real estate agent.* Donald Woods was informed by Max Jennings, a real estate agent who attempted to sell the property for Schmitts in December 1974, that Mosers had a claim to ownership of the farm when the agent showed the farm to Woods on December 8, 1974. We believe that this actual knowledge of Mosers' claim was sufficient to undermine Woods' claim of lack of notice. "A person who has sufficient information to lead him to a fact is deemed conversant with it, and a person who has notice of facts which

would cause a reasonably prudent person to inquire as to further facts is chargeable with notice of the further facts discoverable by proper inquiry." *Janssen*, 166 N.W.2d at 908. Had Woods pursued the notice from Jennings, they would have discovered the pendency of Mosers' equitable action from 1973. Therefore, they are charged with notice of those facts. As we said in *Raub v. General Income Sponsors of Iowa, Inc.*, 176 N.W.2d 216, 220 (Iowa 1970), "One who asserts he is a bona fide purchaser must prove his good faith; and good faith is lacking if he knew or, as a reasonably prudent person, should have known others made claims hostile to his grantor's title."

B. *Notice from their attorney.* Woods also obtained imputed knowledge of Mosers' claims through the activities of their attorney, J. G. Johnson. Johnson authored a title opinion on January 17, 1975, to Woods that expressly noted the existence, in the abstract, of Mosers' pending equitable action for specific performance, damages and to quiet title. The title opinion was also qualified by the existence of an injunction in the Moser action, dated October 16, 1973, which enjoined the defendants in the action from mortgaging, encumbering or conveying the property. The title opinion was followed by several letters from Johnson to R. L. Donahue, counsel for Schmitts. The first, on January 17, 1975, indicated that Johnson felt the Moser action was still pending and prevented ITT Thorp from selling the property. The second, on January 24, 1975, indicated that Johnson felt the title was becoming more nearly fully marketable. In this letter he expressed the opinion that the October 16, 1973, injunction had been dissolved. This was an erroneous opinion. The October 16 injunction was not dissolved. The abstract indicated only that injunctions prior to September 18, 1973, had been dissolved, not those subsequently ordered. A third letter, on March 13, 1975, expressed continued awareness of the cloud that the Moser action placed on the title to the property, but began to question the jurisdiction of the court over ITT Thorp and thus the power to restrict its ability to convey or encumber the property.

A fourth letter, on March 19, 1975, expressed Johnson's opinion that the court did not have jurisdiction over ITT Thorp and therefore, subject to five conditions, the transaction was ready to be closed. This conclusion was in error. ITT Thorp was joined as a party defendant in Mosers' action on September 5, 1974, although there is no evidence that Mosers moved to bind the company to the October 16, 1973, injunction.

Woods assert that the title opinion and letters from Johnson conclude that the title to the property was marketable. We disagree. The title opinion and all subsequent letters note the existence of Mosers' action. Even the final letter conditioned closing on production of an affidavit by a "responsible official of ITT Thorp Corporation" to establish its status as a separate entity from the other Thorp corporations that were party defendants. There is no record that this affidavit was furnished or recorded prior to the date of closing, March 24, 1975, or at any subsequent time. This condition, and four others, indicates that there was no final title opinion that indicated ITT Thorp had a marketable title.

Woods argue that Johnson did indicate that title was marketable and that because they relied upon his legal advice, albeit erroneous, they are entitled to protection as good faith purchasers without notice. This argument presents a question of first impression for this court. In support of their contention Woods cite 92 C.J.S. Vendor & Purchaser, § 326c at 234 (1955) for the proposition:

Where a purchaser, put on inquiry, exercises due diligence, and either fails to discover the existence of adverse rights or defects in the title, or discovers facts sufficient to satisfy a reasonably prudent man that there were no such adverse rights or defects, he will not be chargeable with notice.

As indicated above, we do not believe that Johnson ever approved the title of ITT Thorp in his title opinion or any of the subsequent letters. However, even if we were to find that he had done so, we could

not adopt the position urged by Woods, which is, essentially, that reliance on an attorney's erroneous title opinion is the exercise of due diligence and comprises the discovery of "facts sufficient to satisfy a reasonably prudent man" that no adverse claim exists and therefore he is not to be charged with notice. The position urged by Woods cuts against the grain of Anglo-American legal tradition. The United States Supreme Court stated in *Link v. Wabash Railroad Co.*, 370 U.S. 626, 633–34, 82 S.Ct. 1386, 1390, 8 L.Ed.2d 734, 740 (1962) *reh. denied*, 371 U.S. 873, 83 S.Ct. 115, 9 L.Ed.2d 112,

> Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.'

We have adopted this basic rule for notice to attorneys, *Perpetual Savings & Loan Association v. Van Atten*, 211 Iowa 435, 438, 233 N.W. 746, 747 (1930); *Stevens v. Peoples Savings Bank*, 185 Iowa 619, 624, 171 N.W. 130, 132 (1919), and for knowledge of attorneys, *Petersen v. Farmers Casualty Co.*, 226 N.W.2d 226, 230 (Iowa 1975); *Farnsworth v. Hazelett*, 197 Iowa 1367, 1370, 199 N.W. 410, 411, 38 A.L.R. 814, 817 (1924).

In *Farnsworth* we noted that there are four exceptions to the general rule that knowledge of the attorney is chargeable to the client: (1) the knowledge possessed by the attorney came from a privileged source and is therefore not legally or properly communicable to the client; (2) the attorney had a personal interest that was adverse to the client; (3) the attorney acted fraudulently; or (4) the particular facts of the case allow the general rule to be avoided. *Farnsworth*, 197 Iowa at 1373, 199 N.W. at 412, 38 A.L.R. at 819. We also noted that we did not consider the fourth exception to be well defined or the reasons therefore to

be well based. *Id.*, 199 N.W. at 412, 38 A.L.R. at 819. In the present case the exception based upon 92 C.J.S. Vendor & Purchaser § 326c and urged upon us by Woods is the type-four variety which was questioned as to integrity in *Farnsworth*.

92 C.J.S. Vendor & Purchaser § 326c appears to be based upon three cases. In *Pipkin v. Ware*, 175 S.W. 808, 811 (Tex.Civ. App. 1915) the Texas Court of Civil Appeals found that "if a purchaser has information and pursues a proper inquiry, and ascertains facts which will satisfy a prudent man that there is no defect of title, he can still be an innocent purchaser [citations omitted]". We do not find *Pipkin* to control the issue of reliance on erroneous title opinions because no title opinion was given or relied upon in that case.

The second case, *Federman v. Van Antwerp*, 276 Mich. 344, 347, 267 N.W. 856, 857 (1936) found that "[a]ll that is required of a party who is put upon inquiry is good faith and reasonable care in following up the inquiry which the notice given him suggests." *Federman* is distinguishable because, although a title opinion was involved in the case, the plaintiff had not recorded his interest and, therefore, it did not appear in the abstract or the title opinion. *Id.* at 346, 267 N.W. at 857. *Federman* was, basically, a case resolved by ascertaining which party had recorded his interest first. Since the defendant recorded first, he was a good faith purchaser without notice. *Id.* at 346–48, 267 N.W. at 857. In the present case, Mosers recorded an affidavit that noted their contract of sale before Woods purchased, and the Moser action appeared in the abstract and title opinion.

The third case relied upon by 92 C.J.S. Vendor & Purchaser § 326c is *Loomis v. Cobb*, 159 S.W. 305 (Tex.Civ.App.1913). In *Loomis*, the court, quoting from 2 Pomeroy on Eq. Juris. § 607, found,

> Whenever ... a party has merely received information, or has knowledge of such facts sufficient to put him on an inquiry, and this constitutes the sole foundation for inferring a constructive

notice, he is allowed to rebut the prima facie presumption thence arising by evidence; and if he shows by convincing evidence that he did make the inquiry, and did prosecute it with all the care and diligence required of a reasonably prudent man, and that he failed to discover the existence of, or to obtain knowledge of, any conflicting claim, interest, or right, then the presumption of knowledge which had arisen against him will be completely overcome; the information of facts and circumstances which he had received will not amount to a constructive notice.

*Id.* at 308. In *Loomis* no title opinion was at issue. The notice involved stemmed from a reference, on the face of a deed, to a municipal ordinance that restricted transferability of real estate. *Id.* at 306–07. The ordinance was not of general public circulation and had been lost, and the promulgating corporate municipality no longer existed. *Id.* The claimants were held not to have overcome the presumption of constructive notice of the contents of the lost ordinance because they failed to prove diligent inquiry into the matter. *Id.* at 308.

In summary, although the three cases relied upon in 92 C.J.S. Vendor & Purchaser § 326c support the broad proposition of § 326c, they do not support the narrower theory that reliance upon an erroneous title opinion negates the notice of adverse claims and allows bona fide purchaser status.

■ We agree with the trial court and hold that reliance on a title opinion does not negate a purchaser's notice of adverse claims. This position is supported by *Pierson v. Bill,* 133 Fla. 81, 182 So. 631 (1938), and *Webster v. Knop,* 6 Utah 2d 273, 312 P.2d 557 (1957). In *Pierson,* the court found that,

[w]hen a fact is known sufficient to put a subsequent purchaser upon inquiry he cannot close his eyes to it and excuse himself from pursuing the inquiry by taking the opinion of an attorney upon an abstract of the record title. If this could be done, the rule that 'Whatever is sufficient to put a party upon inquiry,' etc. would be rendered nugatory.

133 Fla. at 94, 182 So. at 636. Similarly, in *Webster* the court said: "Even though value was paid, reliance cannot in such a case be made entirely on title opinions. A title opinion cannot be sufficient to satisfy a duty to inquire as to possible equitable interest any more than it can without inquiry as to rights of parties in possession." 6 Utah 2d at 278, 312 P.2d at 560–61. Woods had notice of Mosers' claims and they cannot negate that notice or their duty to inquire by reliance upon the title opinion of their attorney.

■ C. *Notice from recorded instrument.* In addition to notice from their attorney, Woods obtained constructive knowledge of Mosers' prior claim from the August 27, 1973, recording of the December 1, 1971, offer to buy in an affidavit affecting real estate. In *Loser v. Savings Bank,* 149 Iowa 672, 676, 128 N.W. 1101, 1103, (1910), we decided "that an instrument properly made of record is notice to the world not only of the facts and claims therein expressly set forth, but also of all other material facts which an inquiry thereby reasonably suggested would have developed. . . ." We find that if Woods had pursued the claims set forth in the recorded affidavit, they would have become apprised of the validity of Mosers' prior claim, the pendency of Mosers' action, and the injunction prohibiting transfer or encumbrance of the property.

Woods correctly argued that they did not receive constructive notice of the pending Moser action pursuant to operation of the Iowa lis pendens statute. This was due to the failure of the Clayton County Clerk of Court to properly index the petition filed by Mosers. §§ 617.10–.11, The Code.

■ D. *Notice as assignee of ITT Thorp.* The final element of constructive notice of Mosers' claims the Woods received stems from their possible status of assignees of ITT Thorp. We find in division VI of this opinion that Woods are purchasers from Schmitts and not assignees of ITT Thorp. Nevertheless, we will consider the notice Woods received as assignees because

it adds to the breadth of evidence that supports the trial court finding that they did, in fact, have notice of Mosers' claims. ITT Thorp was made a party defendant in the quiet title division of Mosers' action on September 5, 1974. *See, Moser I*, 256 N.W.2d at 905. We said in *Moser I* that "[a]s this case was submitted to trial court, all interested persons and corporations were parties, including the holder of the certificate of sale, ITT Thorp Corporation. All had notice of Mosers' equitable ownership of the property pursuant to a valid sales contract." 256 N.W.2d at 910. We reaffirm that factual conclusion today, and find that Woods, if in fact they were assigness of ITT Thorp, could have no better rights than the assignor, and thus would be subject to Mosers' prior claim. *English v. Otis*, 125 Iowa 555, 560, 101 N.W. 293, 295 (1904).

It is evident that Woods had prior notice of Mosers' claim before they purchased the property from Schmitts. Such notice is exemplified by language used on the offer to buy from Schmitts' trustee executed by Woods on December 12, 1974, "It is understood and agreed that if seller does not get a title to said property, buyer agrees to accept his money back and this offer shall be null and void." Although Donald Woods testified that "title" meant possession, Max Jennings, the realty agent, testified that "title" meant title, and we find Jennings' testimony more logical. The language of the offer thus expresses concern over the quality of Schmitts' title.

We affirm the trial court ruling that Woods were not good faith purchasers for value without notice.

II. *Propriety of summary judgment and consideration of affirmative defenses.* Woods contend trial court erred in refusing to consider depositions filed on April 14, 1978, in conjunction with the motion for summary judgment, and the consequential failure to find the claims of Mosers barred by laches, equitable estoppel and unjust enrichment. We assume it was error to exclude Woods' depositions from consideration, but find that Woods were not thereby prejudiced and that, therefore, granting of summary judgment was appropriate.

Summary judgment procedure is governed by Iowa R.Civ.P. 237–40. In *Carter v. Jernigan*, 227 N.W.2d 131 (Iowa 1975), we stated the principle governing such motions:

> Where there is no genuine issue of fact to be decided, the party with a just cause should be able to obtain a judgment promptly and without the expense and delay of a trial.... 'In ruling on a motion for summary judgment, the court's function is to determine whether such a genuine issue exists, not to decide the merits of one which does.' (citation omitted) The burden is upon the party moving for summary judgment to show absence of any genuine issue of a material fact. All material properly before the court must be viewed in the light most favorable to the opposing party.

*Id.* at 132; *Daboll v. Hoden*, 222 N.W.2d 727, 731 (Iowa 1974). The motion for partial summary judgment, on the issue of quiet title, was filed by Mosers on March 10, 1978. On March 13 the court ordered that hearing on the motion be held on March 23. On March 21, Woods filed a notice of taking deposition of seven witnesses to be deposed on April 5. On March 23 the trial court was present to hear oral argument but none of the parties appeared, although Woods and FLB filed their resistance to the motion on that date. On March 23 the court ordered that the motion was deemed submitted on that date and the parties had 15 days to file reply arguments. On April 3 the court ordered that because the motion was deemed submitted on March 23 the depositions to be taken on April 5 would not be part of the record considered by the court in connection with the motion. Woods applied to the court on April 6 for a rule 237(f) continuance. However, on April 10, the court entered partial summary judgment quieting title in Mosers and finding that Woods were not good faith purchasers for value without notice. On April 14 Woods filed transcripts of the depositions taken on their behalf on April 5. On April 20 Woods filed a motion to vacate and set aside the

April 10 judgment and decree and for judgment notwithstanding the verdict. The court overruled this motion.

In this division Woods raise, essentially, two issues concerning the summary judgment. These issues concern: (1) the court's refusal to consider the April 5 depositions; and (2) the propriety of summary judgment. We have said, "Discovery matters are committed to the sound discretion of the trial court, and are reviewable only upon an abuse of that discretion." *State v. Webb,* 309 N.W.2d 404, 413 (Iowa 1981); *State v. Gates,* 306 N.W.2d 720, 725 (Iowa 1981).

■ A. *The refusal to consider the depositions.* In analyzing Woods' assignment of errors pertaining to defective summary judgment procedure we are aided by interpretations of Fed.R.Civ.P. 56. *Brody v. Ruby,* 267 N.W.2d 902, 904 (Iowa 1978); *Mid-Continent Refrigerator Co. v. Harris,* 248 N.W.2d 145, 146 (Iowa 1976); *Sherwood v. Nissen,* 179 N.W.2d 336, 339 (Iowa 1970). When a party claims that he has not been given enough time to gather and submit affidavits in resistance to a motion for summary judgment, it is within the discretion of the trial court whether or not to wait for the affidavits to be furnished. *California Apparel Creators v. Wieder of California,* 162 F.2d 893, 901 (2d Cir. 1947) *cert. denied,* 332 U.S. 816, 68 S.Ct. 156, 92 L.Ed. 393 (1947). The matters in consideration for the court are, "not only the materials specifically offered in support of the motion, but also all 'pleadings, depositions, answers to interrogatories, and admissions' properly on file and thus properly before this court. *See Felix v. Young,* 536 F.2d 1126, 1130 (6th Cir. 1976); *Radobenko v. Automated Equip. Corp.,* 520 F.2d 540, 543 (9th Cir. 1975); *Day v. U.A.W. Local 36,* 466 F.2d 83, 86 (6th Cir. 1972). *But see Faulkner v. Baldwin Piano & Organ Co.,* 561 F.2d 677, 683 (7th Cir. 1977), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1450, 55 L.Ed.2d 495 (1978)." *Smith v. Hudson,* 600 F.2d 60, 64 (6th Cir. 1979) *cert. dismissed,* 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979). "Rule 56(c) simply requires the District Court to review the entire record before deciding whether to ren-

der a decision on the merits." *Id.* The April 5 depositions were not part of the record on the date of decision due to the April 3 order of the court. In *Carter,* 227 N.W.2d at 135, we expressed a partial limit on trial court discovery discretion by stating a preference for allowing the parties against whom a motion for summary judgment is made to complete discovery before summary judgment is entered. *Accord, Iowa State Dept. of Health v. Hertko,* 282 N.W.2d 744, 754 (Iowa 1979). We assume, without deciding, that the trial court should have considered the April 5 depositions of Woods as part of the record for decision on the motion for partial summary judgment.

■ B. *Propriety of the summary judgment.* Notwithstanding the trial court exclusion of the April 5 depositions, we find that entry of partial summary judgment was appropriate because, even if the depositions had been considered, there was no genuine issue of fact to be decided by the trial court as to Woods' affirmative defenses or the quiet title issue. Iowa R.Civ.P. 237(c). As we said in *Goodwin v. City of Bloomfield,* 203 N.W.2d 582, 588 (Iowa 1973), "[w]here the only conflict concerns legal consequences of undisputed, underlying facts, entry of summary judgment is proper." Rule 237(e) provides:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or demands of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

Although Woods filed a resistance to the motion for partial summary judgment which disputed the legal consequences of various facts, they did not set forth specific facts that showed there was a genuine issue for trial. Woods alleged that Mosers' claims were barred by laches, equitable estoppel and unjust enrichment but we do not find these claims sufficient to satisfy rule

237(e). These allegations did not raise a genuine issue for trial, but only raised arguments as to the legal consequences of facts not in dispute. Mosers correctly argued that the affirmative defenses of laches and equitable estoppel were not relevant to the issue of good faith purchaser for value without notice. The defenses are, however, relevant to the broader issue of a quiet title action, which was the subject of the summary judgment proceeding. 65 Am.Jur.2d Quieting Title §§ 57–58, at 188–90 (1972). If Woods had raised genuine issues for trial on laches or equitable estoppel, summary judgment would have been inappropriate. However, they did not raise such genuine issues.

■■■■■ 1. *Laches.* We have most recently dealt with laches in *In re Marriage of Ivins,* 308 N.W.2d 75, 77 (Iowa 1981), where we said, "Mere passage of time, . . . does not amount to laches." We also dealt with laches in *Moser I* where we stated:

The doctrine of laches will be applied only where it would be inequitable to permit recovery or is clearly demanded in the interests of justice. *Shives v. Niewoehner,* 191 N.W.2d 633, 637 (Iowa 1971). Ordinarily laches cannot be claimed against one bringing an action within the statute of limitations, absent some special detriment to another. (citations omitted).

256 N.W.2d at 908. Woods base their claim of laches on the facts that Mosers did not attend the August 27, 1973, sheriff's mortgage foreclosure sale, did nothing to prevent Woods from purchasing the farm in December 1974, and made no attempt to obtain possession from 1972 to 1974. The first two allegations are legally insignificant because Mosers had no duty to attend the sheriff's sale or prevent Woods' attempted purchase. The final allegation is factually incorrect. Mosers filed their petition in equity on August 27, 1973, and obtained several injunctions against conveyance or encumbrance of the property. We consider this an effort to obtain possession. There are not facts in any pleadings before the motion for summary judgment or in the April 5 depositions that create a genuine

issue for trial as to laches. Woods did not allege or introduce facts to prove the essential elements of prejudice. *Anita Valley Inc. v. Bingley,* 279 N.W.2d 37, 41 (Iowa 1979). No factual showing of inequity was attempted or made in Woods' resistance or the April 5 depositions. There was no error to the extent the summary judgment was based on the lack of genuine issue as to laches.

■■■■■ 2. *Equitable estoppel.* Woods also failed to show that there was a genuine issue of equitable estoppel. We set out the essential elements of equitable estoppel in *Incorporated City of Denison v. Clabaugh,* 306 N.W.2d 748, 754 (Iowa 1981), which are:

(1) a false representation or concealment of material facts;

(2) a lack of knowledge of the true facts on the part of the actor;

(3) the intention that it be acted upon; and

(4) reliance thereon by the party to whom made, to his prejudice and injury.

These elements are applicable in the present case. *See Farmers & Mechanics Savings Bank v. Campbell,* 258 Iowa 1238, 1247, 141 N.W.2d 917, 922 (1966). Nowhere do Woods approach the required degree of specificity in either allegation or proof of the elements of equitable estoppel. Only the second and fourth elements were alleged in their pleadings, including the resistance to the motion for summary judgment. The April 5 depositions add nothing. The trial court did not abuse its discretion to the extent the summary judgment was based on lack of genuine issue of equitable estoppel.

■■■■ 3. *Unjust enrichment.* Woods also raised a claim of unjust enrichment. The United States Court of Appeals for the Eighth Circuit, in *Iconco v. Jensen Construction Co.,* 622 F.2d 1291, 1302 (8th Cir. 1980) said, "We are impressed with the simplicity of the rule echoed by the Iowa unjust-enrichment cases. '[I]t is essential merely to prove that a defendant has received money which in equity and good conscience belongs to the plaintiff.'" *See*

*In re Estate of Stratman*, 231 Iowa 480, 488, 1 N.W.2d 636, 642 (1942). Woods' allegations of unjust enrichment were entirely conclusory, unsupported by legal or factual argument. The record justifies a conclusion that there was no genuine issue of unjust enrichment, that the April 5 depositions did not create or support any such issue, and the trial court was justified in granting summary judgment, at least in regard to unjust enrichment.

Mosers made and adequately supported a motion for partial summary judgment on the quiet title issue in this action. Iowa R.Civ.P. 237(c). Woods failed to establish any genuine issue for trial as to their affirmative defenses or the quiet title issue with their resistance, or with the April 5 depositions which were not considered by the trial court. Therefore, pursuant to rule 237(e), summary judgment of quiet title for Mosers was appropriate.

■ The consideration given to the April 5 depositions above should not be viewed as a retreat from the rule of *Lyon v. Willie*, 288 N.W.2d 884, 894 (Iowa 1980), which found de novo fact finding inappropriate on appeal from summary judgments, even at equity. We considered the April 5 depositions to determine if genuine issues of fact existed, not to find facts. This complies with what we said in *Scott v. Habinck*, 192 Iowa 1213, 1217, 184 N.W. 817, 818 (1922), "[t]here should be an end to litigation somewhere." This matter has been in dispute for over 10 years, " . . . we are not disposed to prolong the quarrel by . . . [remanding to consider the April 5 depositions] . . . simply to have [the parties] re-enter with the same bone of contention . . ." *Id.*, 184 N.W. at 818. "A court of equity ought to do justice completely, and not by halves." *Camp v. Boyd*, 229 U.S. 530, 551, 33 S.Ct. 785, 793, 57 L.Ed. 1317, 1327 (1913). " 'Wherever a situation exists which is contrary to the principles of equity and which can be redressed within the scope of judicial action, a court of equity will devise a remedy to meet the situation, though no similar relief has been given before.' *McClintock on Equity*, § 29 at 76

(2d ed. 1948)." *Holi-Rest, Inc. v. Treloar*, 217 N.W.2d 517, 527 (Iowa 1974); *Holden v. Construction Machinery Co.*, 202 N.W.2d 348, 363–64 (Iowa 1972). Therefore, in the instance limited to this cause we have considered depositions not part of the record considered by the trial court for the summary judgment, and conclude that, as a matter of law, Woods cannot prevail on the quiet title issue.

■ III. *Denial of occupying claimant damages.* In the August 2, 1979, judgment the court, after trial, denied Woods' counterclaim for the value of improvements made upon the farm while they were in possession. Woods claim error but we find none.

■ Woods were in possession of the farm from March 24, 1975, until April 25, 1978. Woods, in a counterclaim filed on April 7, 1978, claimed that they had erected improvements worth in excess of $47,000.

In *Lunquest v. TenEyck*, 40 Iowa 213 (1875) we said:

> By the common law there was no liability, on the part of the true owner, to pay for improvements made by an occupying claimant of real property, who had no title thereto. All improvements annexed to the free-holder, became part of and passed with the recovery. (Citation omitted). The right to recover payment for improvements thus made is based entirely upon our statute, and, of course, in order to recover therefore, such claimant must bring himself within its provisions.

*Id.* at 214–15. Such claims must be made under chapter 560 of the Code. For purposes of analysis we will assume that Woods' counterclaim was a petition of an occupying claimant. § 560.3, The Code.

Section 560.1 provides, in pertinent part, that an occupant of real estate who had color of title to the property and in good faith made valuable improvements on the property and is later adjudged not to be the owner of the land may be able to recover the value of the improvements. Section 560.2 establishes five classes of persons who are deemed to have color of title. The trial

court found that Woods had neither color of title nor good faith. We agree.

■ Woods claimed color of title pursuant to subsections (1), (3) and (4) of section 560.2. Section 560.2(1) requires the judicial sale purchaser to have purchased in good faith. We determined in division I that Woods did not purchase in good faith. Woods did not even purchase at a judicial sale. Section 560.2(3) requires express or implied consent of the real owner in the improvements the occupying claimant makes. None was present here. Section 560.2(4) requires payment of real estate taxes by the occupying claimant and the elapse of two years' time without a repayment or offer of repayment by the owner. The trial court found that Mosers' pending action constituted a continuing offer to repay the taxes and held that Woods could not obtain color of title under that subsection. We agree.

■ The trial court also found that there was an absence of good faith on the part of Woods. We agree. It appears that the good faith standard under the occupying claimant statute is a lesser standard of "goodness" than that involved in bona fide purchaser status discussed in division I. *See Meyers v. Canutt*, 242 Iowa 692, 698, 46 N.W.2d 72, 76, 24 A.L.R.2d 1, 6 (1951). In *Read v. Howe*, 49 Iowa 65, 66 (1878), we found that an occupying claimant was not affected, in respect to his rights as an occupying claimant, by notice of pendency of an action, whether or not it was indexed in lis pendens. In *Craton v. Wright*, 16 Iowa 133, 138 (1864), we held that an honest belief on the part of the occupying claimant was sufficient, even where he had actual notice of an adverse claim and that adverse claim had been established by an adjudication. However, in *Welles v. Newsom*, 76 Iowa 81, 84, 40 N.W. 105, 107 (1888), we found that where the claimants had been notified an action would be commenced, and the petition was actually filed, improvements made after that time cannot be regarded as made in good faith under color of title based on possession only. Woods came closer to satisfying the good faith requirement for occupying claimants than they did for bona fide purchasers, but we affirm the trial court's finding that they were not in good faith.

■ The fact that Woods paid real estate taxes during their period of possession does not control the good faith issue. We said in *Resnick v. City of Fort Madison*, 259 Iowa 578, 581, 145 N.W.2d 11, 13 (1966), "But assuming plaintiff did pay the taxes, it is only evidence of good faith. It is by no means conclusive. Good faith at least requires some reasonable basis for the belief that plaintiff and her predecessor had title to the land."

The trial court was correct in finding that Woods were not in good faith and did not have color of title and therefore were not entitled to recover the value of their alleged improvements. Even if Woods had established a right to recovery under the occupying claimant statute, the record indicates that the amount of the recovery, established by the value of the improvements to the rightful owner, would be de minimus. *McMurray v. Day*, 70 Iowa 671, 674, 28 N.W. 476, 478 (1886).

■ IV. *Supplemental pleadings.* On February 22, 1979, Mosers filed an application for authority to file supplemental pleadings against Woods. The district court, in the exercise of its discretion, granted the application. The supplemental pleadings sought money recovery, an accounting of lost rents, profits and damages for the period that Woods were in possession of the land; recovery of the 1977 corn crop, costs and attorneys fees; and general equitable relief. Woods contend that allowance of the supplemental pleadings was improper. We disagree.

Supplemental pleadings are governed by Iowa R.Civ.P. 90 which provides:

By leave of court, upon reasonable notice and upon such terms as are just, or by written consent of the adverse party, a party may serve and file a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to

be supplemented. Leave may be granted even though the original pleading is defective in its statement of a claim for relief or defense.

Mosers' February 22 supplemental pleading amended their August 27, 1973, petition in equity. It set forth occurrences that had happened since 1973 and which were not before the court in *Moser I*, such as Woods' possession of the farm and alleged damages to the land and buildings. Woods contend that Mosers did not allege facts subsequent to the September 1, 1977, amendment to the petition which added them as defendants to the action. Although we are inclined to use August 27, 1973, as the base date for analyzing the sufficiency of the supplemental pleading, even if September 1, 1977, is used, Mosers have alleged facts subsequent to that date. Mosers alleged that Woods were in possession from September 1, 1977, until April 25, 1978, and that there was a loss of rent and profits and damage to land and buildings during this time. Mosers met the pleading requirements of rule 90. It was within the discretion of the trial court to grant leave to file the supplemental pleadings. *Johnston v. Percy Construction, Inc.*, 258 N.W.2d 366, 370 (Iowa 1977). We find no abuse of that discretion.

■■■ Woods contend that since they were added as defendants only to the quiet title action, there should be no pleadings allowed as to money damages. This argument misapprehends the nature of equitable jurisdiction. We stated in *Simpson v. Bostwick*, 248 Iowa 238, 244, 80 N.W.2d 339, 343 (1957):

The rule is too clear to require citation, that once equity has obtained jurisdiction of a controversy it will determine all questions material or necessary to accomplish full and complete justice between the parties, even though in doing so it may be required to pass upon some matters ordinarily cognizable at law. (citations omitted).

A prayer for general equitable relief, such as Mosers made in the original quiet title division and renewed in the supplemental pleading, "is to be construed liberally, and will often justify granting relief in addition to that contained in the specific prayer, provided it fairly conforms to the case made by the petition and the evidence." *Holi-Rest, Inc. v. Treloar*, 217 N.W.2d 517, 526 (Iowa 1974). Thus, even if all the rent, damage and profit elements of the supplemental pleading would have been legal in nature, they are still permissible subjects to be raised by supplemental pleadings in an equity action. This case is similar to *Reiger v. Turley*, 151 Iowa 491, 131 N.W. 866 (1911), where we found:

The amendment of the petition asking, as an alternative relief, the return of the advance payment, in case equitable relief be denied, did not change the [equitable] nature of the action. Such demand for a money recovery is a very frequent incident in equitable proceedings, and does not of itself indicate that the action is pending in the wrong forum, or that plaintiff in asking it has abandoned his claim for purely equitable relief.

*Id.* at 498, 131 N.W. at 868. We find that the leave to file supplemental pleadings was permissible and, although the pleadings filed added a legal issue, they did not change the general equitable nature of Mosers' action.

■■■ Woods also contend that since the partial summary judgment of April 10, 1978, disposed of the quiet title action, the court was without jurisdiction to permit Mosers to file supplemental pleadings to that division of their action on February 22, 1979. This argument is without merit. The partial summary judgment, which quieted title in Mosers subject to their payment of $45,479.14, stated that "hearing be held ... May 30, 1978 ... at which time the court will consider the matter of the adjustments of rents and profits and damages and of the report of the receiver ...." It is, therefore, apparent that the trial court did not consider all the issues of the quiet title division of Mosers' action to be resolved. The August 2, 1979, judgment reflects this by disposing of the rent and profit claims of Mosers, and the damage claims of both Woods and Mosers. We hold

that the trial court had jurisdiction over the quiet title action on February 22, 1979, and therefore there was no abuse of discretion in its permission to allow Mosers to file supplemental pleadings.

▉ Woods, in effect, urge us to adopt a double standard, allowing them to maintain their April 7, 1978, counterclaim for money damages in the quiet title action, but denying Mosers the right to file their February 22, 1979, supplemental pleadings seeking similar damages. This we refuse to do. Our decision here comports with our decision in *Johnston.* In *Johnston,* under a dual analysis of rules 88 and 90, the trial court was held to have abused its discretion by denying the plaintiff leave to amend his petition. 258 N.W.2d at 371. This holding was supported by two factual findings, both of which are present in the case at bar. First, the nature of the amendment could not have surprised the defendant. *Id.* at 371. Similarly, in the present case Woods can be deemed to have expected to be sued for damages after they had claimed damages. Second, the amendment did not substantially change the issues or the theory of recovery. *Id.* In the present case the primary theory for quieting title and for damages was the wrongful possession of Schmitts, and then Woods. In addition, the *Johnston* court noted that the case was not ready for trial because discovery was incomplete and therefore leave to amend the petition did not prejudice the defendant. *Id.* Similarly, Woods, in their resistance to the application for leave to file supplemental pleadings, admitted that discovery was not complete on the allegations contained in the supplemental pleading. We find the facts of *Johnston* support the conclusion that the trial court did not abuse its discretion when it allowed Mosers to file supplemental pleadings. We note, in passing, that it is generally preferable to allow supplemental pleadings and amendments than to deny them. *Id.* at 370. We also note the provisions of Iowa R.Civ.P. 107, which supports our conclusion here:

> In any case ... for specific equitable relief, where the facts pleaded and

proved do not entitle the petitioner to the specific remedy asked, but do show him entitled to another remedy, the court shall permit him on such terms, if any, as it may prescribe, to amend by asking for such latter remedy, which may be awarded.

▉ V. *Denial of request for jury trial.* Woods contend the trial court erred in trying to the court, instead of a jury, the issues raised by their counterclaim and Mosers' supplemental pleadings. We disagree with Woods as to the counterclaim, but agree as to the supplemental pleadings. However, Woods were not harmed by the error.

▉ A. *Woods' counterclaim.* Woods were not entitled to a jury trial on the issues raised by the counterclaim because they failed to make a timely request for a jury trial. Iowa R.Civ.P. 177(b) provides, in pertinent part, "A party desiring jury trial of an issue must make written demand therefor by filing a separate instrument clearly designating such demand not later than ten days after the last pleading directed to that issue." Fed.R.Civ.P. 38(b) is substantially the same.

The facts of the present appeal indicate a failure on the part of Woods to make a timely demand for jury trial of the issues in the counterclaim. Woods' counterclaim was filed on April 7, 1978, and Mosers replied on April 14. To be timely, the demand for jury trial was required to be filed by April 24, or 10 days after the reply to the counterclaim. *See 5 J. Moore, Federal Practice,* ¶ 38.39[2] at 348 (2d ed. 1981). No timely demand was made at that juncture. Because of Woods' failure to make timely demand, we need not decide whether actions under chapter 560, The Code, are at law and therefore triable to a jury or at equity, where there is no right to a jury. *Katchen v. Landy,* 382 U.S. 323, 337, 86 S.Ct. 467, 477, 15 L.Ed.2d 391, 401 (1966). We have said that actions under chapter 560 are equitable in nature. *Betz v. Sioux City,* 239 Iowa 95, 98–100, 30 N.W.2d 778, 780 (1948). However, section 560.3 provides that the issues of the occupying claimant action are to be tried as in ordinary actions.

Section 611.3 states: "[P]roceedings in civil actions may be of two kinds, ordinary or equitable." Thus, there may be a right to jury trial for actions under chapter 560. We implied as much in *Meyers v. Canutt*, 242 Iowa 692, 696, 46 N.W.2d 72, 75, 24 A.L.R.2d 1, 5 (1951). *See generally*, 42 C.J.S. Improvements, § 14(h)(1) at 465 (1944).

Woods also were not entitled to a jury trial on the issues raised by their June 18, 1979, amendment of counterclaim. No timely demand for jury trial was made. Also, the amendment presented no additional occupying claimant issues over and above the April 7, 1978, counterclaim. It only increased the amount of damages sought for nonoccupying claimant items. It was, therefore, appropriate to deny jury trial on the amendment to counterclaim. *5 J. Moore*, ¶ 38.93[2] at 353.

■ B. *Mosers' supplemental pleading*. Woods should have been granted a jury trial on the issues of soil erosion and deterioration of the buildings while Woods were in possession as claimed in Mosers' supplemental pleading, which was filed on February 22, 1979.

■ However, the failure of the court to grant a jury trial on the law issues is not reversible error in the present case because the court found for Woods on the issues where they were improperly denied a jury trial. The judgment of August 2, 1979, denied Mosers any recovery from Woods for damage to the land or buildings. In division VII we uphold that ruling. To remand this cause for jury trial on those issues would be an exercise in futility. Mosers did not demand a jury on those issues.

We find no reversible error in the court's denial of Woods' requests for jury trial.

■ VI. *Priority to the fund*. Woods, Mosers and FLB claim priority to the fund of $45,479.14 on deposit with the Clayton County Clerk of Court. The August 2, 1979, judgment of the trial court ordered that this fund be held by the clerk pending disposition of this appeal. We are not prepared to determine the priority of disburse-

ment from this fund. Rather, we take this opportunity to clarify *Moser I* in this regard and remand this issue to trial court for disposition consistent with the fact-finding herein and such additional evidence as may be appropriate.

In *Moser I* we found that, "[a]bsent evidence her rights have been otherwise protected, Lola Jean Woods shall be regarded as the assignee of the rights of ITT Thorp Corporation and Thorp Finance and entitled to [the $45,479.14 fund]." 256 N.W.2d at 912. We have found no evidence that Lola Jean Woods' rights are otherwise protected, but we have found evidence in the present record that leads us to conclude that Woods acquired their property interest by purchase from Schmitts, not through assignment of the certificate of sheriff's sale from ITT Thorp.

This change in analytical approach stems from facts developed after *Moser I* in a series of admissions by Woods and summary judgment exhibits submitted by Mosers. In November 1974, Max Jennings, a real estate agent from Oelwein, began to attempt to procure a purchaser from Schmitts for the farm Mosers claimed to own but of which Schmitts had possession. In pursuit of this endeavor, Jennings showed the farm to Donald Woods on December 8, 1974. Woods executed an offer to purchase on December 12, 1974. Volney Palmer, trustee for Schmitts, accepted the offer on the same day.

According to the "Richard Schmitt Trust Account" in the possession of Palmer, on December 13, a $43,500 money order was deposited into the trust account. Palmer assumed that Donald Woods was the remitter of the money order. This assumption proved to be incorrect. The source of the $43,500 was the Oelwein State Bank, which had issued a note in that amount on December 13. R. L. Donohue, attorney for Schmitts, was the debtor on the note, as evidenced by a security agreement filed by the bank on December 13. On December 13 Palmer disbursed $42,561.83 to ITT Thorp and $563 to Thorp Finance. This disbursement shows that Schmitts redeemed the

real property from ITT Thorp on December 13, 1974. This redemption was possible because ITT Thorp agreed to extend Schmitt's period of redemption until December 13, 1974. Upon payment, Schmitts obtained possession of the certificate of sale, which ITT Thorp relinquished without endorsing Schmitts' name onto it. At this point, Schmitts owned the property again, as they had prior to the December 1, 1972, action, subject, of course, to Mosers' pending claim of purchase.

Thus, as Woods began to perform the contract of sale, the transaction must be seen as a sale from Schmitts to Woods, not an assignment from ITT Thorp to Woods. The name of Lola Jean Woods was filled in on the blank assignment of certificate of sheriff's sale, dated October 16, 1974, but the essence of the transaction was not an assignment. Woods admitted they did not even know of the property until December 6, 1974. The reasons for the rather stilted form of the transfer are unclear and we hesitate to imply illegality or fraud on the part of any of the parties. It is clear, however, that the transfer was by sale, not by assignment.

Woods' first expenditure of funds was $9000 earnest money paid to Jennings with the offer on December 12. Jennings deposited this sum to the Richard Schmitt Trust Account on February 2, 1975. On February 3, 1975, a check drawn by Woods for $41,000 was deposited in the trust account. On February 8 the Oelwein State Bank was paid $44,068.44 from the account in repayment of the December 13 note. At this point, both ITT Thorp and the Oelwein State Bank had been paid in full.

On the date of closing between Woods and Schmitts, a $40,000 check from Woods was deposited in the trust account. In sum, Woods spent $90,000 to acquire title to the property. On March 24, 1975, Schmitts covenanted with Woods that the sheriff's deed Woods received would be of the same force and effect as a warranty deed. Volney Palmer, trustee, also executed a quit claim deed to Lola Jean Woods on May 4, 1975. The sheriff's deed to Woods was dated December 16, 1974, and filed March 24, 1975. A mortgage dated February 26, and filed March 24, indicated that FLB loaned Woods $76,500 to purchase the farm.

After the expenses of the trust account, including, *inter alia*, real estate commissions, attorneys and trustees fees, Schmitts received $24,756.76 and the account was closed. The state of events at this point can be summarized: ITT Thorp had been paid in full and relinquished the certificate of sale to Schmitts; Oelwein State Bank had been paid in full; Schmitts had $24,756.76 but had given up possession of the land and purportedly transferred title to Woods; FLB had extended $76,500 to Woods and secured it with a mortgage on the farm; Woods had spent $90,000 ($76,500 was from FLB) to obtain possession and title to the land; and Mosers had paid in $8430 down payment on the property and had neither possession nor title.

The three judgments rendered after remand in *Moser I* ordered that: the $8430 down payment held by the Clayton County clerk be returned to Mosers; Mosers have judgment against Schmitts for $22,199.69 plus interest and against Woods for $51,065.51 plus interest, subject to set off for taxes Woods paid; Mosers have possession of the land (they are presently in possession) and have title quieted in them; and that Mosers pay a $45,479.14 fund to the clerk of court (which they have subsequently done), the fate of which has been stayed by the trial court pending this appeal.

We remand the issue of priority of payment from the fund of $45,479.14, plus accumulated interest, to the trial court for decision on the existing record and such additional evidence as may be appropriate. The parties shall be allowed to amend their pleadings to allege any additional matters that may have occurred since the last trial that may bear on entitlement to the fund. We express no opinion as to who shall have priority as to that fund, or in what amounts. Rather, in this regard, we hold: that the fund does not represent, as we implied in *Moser I*, 256 N.W.2d at 912, an amount required for redemption; and that

Woods are not the assignees of ITT Thorp. With those modifications of *Moser I*, we remand this issue to the district court for further appropriate proceedings.

■ VII. *Denial of damages for depletion of the land and deterioration of the buildings.* The trial court denied Mosers recovery of damages for erosion of the land for the period Woods were in possession of the farm and deterioration of the buildings for the period Woods and Schmitts were in possession of the farm. Mosers appeal this ruling and we affirm. Although damages could have been properly awarded to Mosers, we agree with the trial court that Mosers failed to prove damages or the liability of Woods by a preponderance of the evidence.

In regard to the question of compensation for damages to real property, we said, in *Schiltz v. Cullen-Schiltz & Assoc., Inc.,* 228 N.W.2d 10 (Iowa 1975):

> [T]he principle underlying allowance of damages is to place the injured party in the same position, so far as money can do it, as he would have been had there been no injury or breach of duty, that is, to compensate him for the injury actually sustained . . . .
>
> Where the injury is such that the premises may be restored to as good condition as it was before, the measure of recovery is the fair and reasonable cost and expense of such restoration.

*Id.* at 20–21. The Restatement (Second) of Torts, § 929(1) (1979), allows this type of damages to include compensation for:

> (a) the difference between the value of the land before the harm and the value after the harm, or at his election in an appropriate case, the cost of restoration that has been or may be reasonably incurred,
>
> (b) the loss of use of the land, and
>
> (c) discomfort and annoyance to him as an occupant.

An upper limit to recovery has been recognized by this court, "if the property is repairable and the cost of repairs exceeds the market value, (or in the event no market value can be established, the real or actual value) recovery is limited to such before-accident value." *State v. Urbanek,* 177 N.W.2d 14, 16–17 (Iowa 1970).

■ The supplemental pleadings of Mosers alleged, in detail, various items of damages to the land and buildings of the farm during the period of Woods' and Schmitts' possession. Equity courts, as well as courts of law, give effect to the general rules of evidence. 27 Am.Jur.2d Equity § 236 at 798 (1966); *see Sullivan v. McLenans,* 2 Iowa 437, 442 (1856).

The court denied Mosers recovery for the alleged damages to the land and buildings. The court had denied Mosers a similar recovery against Schmitts in the September 5, 1978, judgment and decree.

Upon our review of the entire record, including the June 25–27, 1979, trial transcript, and without unduly extending this opinion, we agree with the trial court conclusion that much of the testimony introduced was inadmissible. We affirm the denial of Mosers' damage claim for deterioration to the land and buildings because it was not sustained by a preponderance of the competent evidence.

VIII. *Award of crops.* The August 2, 1979, judgment awarded Mosers $908 against Woods for the value of straw removed from the property by Woods, who contend this was in error. The judgment also stated that since Mosers were being awarded cash rent, the disposition of the 1977 corn crop, then in possession of Gary Woods, was to be settled between Woods, FLB and intervenor. Mosers contend this solution was in error. We agree with the trial court's disposition as to the corn but disagree as to the straw.

Mosers admit that they are not entitled to both cash rent for 1977 and the 1977 corn crop. Their preference for the crop is understandable, because its value was $50,074.62 whereas the cash rental value was $17,000. However, to award them the corn crop would be, in essence, an award to Mosers of the labor of Woods, plus the amount expended for seed, fertilizer and custom work. We will not make such an award in this case.

The straw was produced as a by-product of the 1976 oats crop raised by Woods. The court's treatment of the straw in a manner different from the 1977 corn crop was error. The corn and straw should be treated identically, that is, Woods are entitled to possession of both crops but are liable for the fair rental value of the land for the period of their possession.

The question as to the date Mosers are deemed to be owners of the land is of crucial importance in resolution of this issue. Woods maintain that Mosers were not owners of the property until April 10, 1978, the date of the partial summary judgment quieting title in Mosers, and therefore not entitled to rental value or crops while Woods occupied the land. Mosers contend that they are to be deemed owners of the property as of January 15, 1972, the date the original Moser-Schmitt closing was scheduled. We find that Mosers' title dates back to January 15, 1972.

In *Moser I* we said:

> If Mosers elect to acquire the farm by quiet title decree and perform the above condition [payment of $45,479.14], the court shall adjust the equities between the Mosers and the Schmitts occasioned by Schmitts' failure to timely perform their sales contract in the same manner as though specific performance had been decreed.

256 N.W.2d at 913. An adjustment of the equities as though specific performance had been decreed requires that title be vested in Mosers as of the date originally contemplated by the sales contract, January 15, 1972. *Kimsey v. Posey*, 148 Ky. 54, 57, 145 S.W. 1121, 1122 (1912). *See Chadek v. Alberhasky*, 253 Iowa 32, 40–41, 111 N.W.2d 297, 302 (1961). At the time of *Moser I*, we believed that Mosers could not be granted specific performance in the sense of "gaining the full benefit of their land contract." 256 N.W.2d at 910. However, as we indicated in division VI of the present opinion, Schmitts regained title to the property on December 13, 1974. At that point specific performance was possible. In any case, we will adjust the equities as if specific performance had been decreed and hold that Mosers were owners of the title to the property from January 15, 1972.

A purchaser, such as Mosers, can elect to receive rents and profits as damages from the time conveyance should have been made. *Calbreath v. Borchert*, 248 Iowa 491, 496–97, 81 N.W.2d 433, 437 (1957); *Mitchell v. Mutch*, 189 Iowa 1150, 1153, 179 N.W. 440, 441 (1920); 71 Am.Jur.2d Specific Performance § 218 at 280–82 (1973); Annot. 7 A.L.R.2d 1204 (1949).

> While this pecuniary compensation is often referred to by the courts as 'damages', it should ... be more properly considered as equitable compensation in the nature of an accounting between the parties rather than legal damages, since the court in awarding specific performance is confirming the contract and erasing the breach.

71 Am.Jur.2d Specific Performance § 216 at 276 (1973).

The trial court found Mosers to be entitled to $20,900 rent from Schmitts and $46,275 rent from Woods. We affirm these awards. The award of rents precludes, in this case, the award of any of the crops to Mosers. Because we believe there is no difference in treatment merited between the corn and straw, we affirm the award of the 1977 corn crop to Woods but do not uphold the award of $908 to Mosers for the straw removed by Woods.

IX. *Rent.* As previously stated, the judgments for Mosers against Schmitts and Woods were, in part, comprised of damages for rent of $20,090 and $46,275, respectively.

A. Woods contend that no damages for rent should have been awarded. We disagree with this contention for the reasons developed in division VIII and affirm the judgment against Woods for rent.

B. Mosers contend that the trial court improperly set off $5062.50 of rent from Schmitts by charging Mosers 5 percent interest on the unpaid balance of their purchase price on the December 1, 1971, offer. We disagree with this contention.

The trial court adjudicated the adjustment of rents, profits and damages between Mosers and Schmitts on September 20, 1978. It used the rent values from *Moser I* to establish a gross rental value of $20,090 for the property for the years 1972 to 1974 when Schmitts were in possession. 256 N.W.2d at 913. The court then reduced the gross rent by $5062.50, which represented five percent annual interest on the unpaid purchase price of $33,750 for the years 1972 to 1974. There was no error in reducing the gross rent due by interest on the unpaid purchase price.

We said, in *Mitchell v. Mutch*, 189 Iowa 1150, 1153, 179 N.W. 440, 441 (1920):

A purchaser who obtains a decree for specific performance may elect to pay interest on the purchase price for the time elapsed since the conveyance should have been made, and take the rents and profits received by the vendor, *or* allow the latter to retain these, and thereby relieve himself of liability for interest. 2 Sutherland on Damages (3rd Ed.) Section 588.

(emphasis added). It is clear that the purchaser can either collect rents and profits and pay the interest or allow the vendor to keep the rents and profits but escape payment of interest. 71 Am.Jur.2d Specific Performance § 219 at 282 (1973). Such a rule is not in violation of the basic premise that a vendor who has wrongfully delayed performance of the contract should not obtain any benefit from the delay. *Mitchell*, 189 Iowa at 1153, 179 N.W. at 441; 71 Am.Jur.2d Specific Performance § 219 at 282 (1973).

It is not because the rental value of the land is, or is supposed to be, equal to the interest on the purchase-money that the right of election is given. It is, often, and perhaps in most cases it is less. But the enjoyment of the possession of the land, according to the contract, may be of more value to the purchaser, or he may regard it as of more value to him than the amount of rents and profits he might realize from the use.

Annot. 7 A.L.R.2d 1204, 1218 (1944). We will assume Mosers would elect the $20,090 for rent rather than the $5062.50 for interest and affirm the court's reduction of the gross rent by the interest on the unpaid purchase price.

Mosers also contend that interest on the rents due should be assessed from the dates of payment established by the usual payment procedure in Clayton County, instead of on an annual basis. In Clayton County rentals for farmland are usually paid twenty-five percent on or before March 1, 25 percent on or before September 30, and the remaining 50 percent on or before December 30. The trial court computed interest from March 1 of the following year.

[I]f rents and profits are recoverable by the purchaser, either actually as having been received or hypothetically as rental value, interest may be awarded him, in the equitable discretion of the court, upon the sums figured annually or according to the customary rental periods for such property in the locality where it is situated . . . .

71 Am.Jur.2d Specific Performance § 218 at 280 (1973). *See Schiavone v. Ashton*, 269 Ill.App. 386, 396 (1933); *Worrall v. Munn*, 38 N.Y. 137, 150–51 (1868); Annot. 7 A.L.R.2d 1204, 1217 (1949). In essence, the rule is that the court in equity can assess interest from periods which it deems equitable. It would have been permissible for the trial court to assess interest on the rent damages from the three customary annual payment dates. We do not, however, find an abuse of discretion by the trial court's assessment of interest from March 1 of the following years.

Therefore, we affirm the scheme of interest computation employed by the court and the judgment entered on September 20, 1978, concerning damages for rent in favor of Mosers against Schmitts and Woods.

X. *Real estate tax set off.* The August 2, 1979, judgment for Mosers for damages for rent, interest, and the removed straw crop allowed Woods a set off of $3131.26 for real estate taxes paid by

Woods while in possession of the land. Mosers contend this was error but we disagree, subject to adjustment of the amount allowed to be set off.

It appears Woods should be entitled to reimbursement for the money they spent on the real estate taxes. "As a condition to granting relief the court will, as a general rule, require plaintiff to reimburse the defendant, with interest, for all taxes and assessments properly chargeable on the land and paid by him, and declare a lien on the land to secure such reimbursement." 74 C.J.S. Quieting Title § 102c at 154 (1951). This court has, in the past, endorsed such a solution. *Chadek v. Alberhasky*, 253 Iowa 32, 40–41, 111 N.W.2d 297, 302 (1961). Several jurisdictions follow this general rule. *See, e. g., Kalivoda v. Pugh*, 170 Kan. 505, 509, 226 P.2d 857, 859 (1951) (plaintiff did not object to offset for taxes paid by defendant); *Bonninghausen v. Hansen*, 305 Mich. 595, 607, 9 N.W.2d 856, 861 (1943); *New York and Brooklyn Suburban Inv., Co. of New York v. Leeds*, 100 Misc.2d 1079, 1092, 420 N.Y.S.2d 639, 647 (N.Y.Supp. 1979); *United Accounts, Inc. v. Larson*, 121 N.W.2d 628, 634 (N.D.1963); *Parks v. Hughes*, 312 P.2d 435, 437 (Okla.1957). Contra, *Iowa Homestead Co. v. Des Moines Nav. & R.R. Co.*, 84 U.S. (17 Wall.) 153, 166–67, 21 L.Ed. 622, 623–24 (1873); *Garrigan v. Knight*, 47 Iowa 525, 527 (1877); *Kimball v. Baker Land & Title Co.*, 152 Wis. 441, 453, 140 N.W. 47, 51 (1913).

We are inclined to follow the general rule under the facts in this case and affirm the set off for taxes paid. The record indicates that Schmitts paid $260.02 of the taxes. Therefore, the sum of $3131.26 should be reduced by $260.02 which will be allowed as a set off to Schmitts on the judgment rendered against them for $22,199.69. With this adjustment we affirm the set off for real estate taxes paid by Woods to the extent of $2,871.24.

XI. *Summary.* We have considered all of the many contentions of the parties and, except as discussed above, find them without merit, waived pursuant to Iowa R.App.P. 14(a)(3), or unnecessary to disposition of the case. As to Woods' appeal, the court's decree is modified by reducing Mosers' judgment against them by $908. This reduction represents the value of the straw removed as discussed in division VIII. As modified, Woods' appeal is affirmed. As to Mosers' cross-appeal, the trial court's judgment for Mosers is modified by reducing the setoff of Woods for taxes paid by $260.02 and allowing Schmitts a setoff for $260.02. As modified, Mosers' cross-appeal is affirmed. The contentions raised by the cross-appeal of FLB will be addressed by the trial court upon remand.

The case is remanded for resolution of the priority issue discussed in division VI and further proceedings consistent with this opinion.

We note the parties have made our task more difficult by failing to organize the appendices in chronological order pursuant to Iowa R.App.P. 15(d).

Costs in this court are taxed three-fourths to Lola Jean and Donald Woods, one-eighth to Mosers, one-eighth to FLB.

AFFIRMED AS MODIFIED ON APPEAL AND CROSS-APPEAL; AND REMANDED.

All Justices concur except UHLENHOPP and LARSON, JJ., who concur specially as to division VII, and REYNOLDSON, C. J., McCORMICK and SCHULTZ, JJ., who dissent as to division VII.

UHLENHOPP, Justice (concurring specially).

I concur in the result reached by the court majority and I also concur in the majority opinion except for part of the division relating to soil erosion. I join in Chief Justice Reynoldson's opinion as to the *liability* of the Woods for soil erosion, but I concur in the majority holding that the Mosers failed to prove their *damages* from erosion by substantial evidence.

LARSON, J., joins this special concurrence.

REYNOLDSON, Chief Justice (concurring in part and dissenting in part).

In this long-lasting legal war several parties were injured, but a major casualty was the Clayton County farm. The wholly believable evidence in this case shows that with proper care it may recover in about fifty years.

Although this record reflects they were careless farmers, defendants Schmitts farmed this 285-acre tract only in "patches" and rotated crops.[1] In fact, the weeds they tolerated on the farm diminished the risk of soil loss. There was little evidence of erosion when they left the farm.

Defendants Woods took over this property in March 1975, under a contract containing a special money-back provision if the seller did not get title. Trial court found they were not good faith purchasers. They called this the "Hill Farm" because it was hilly. In his testimony Donald J. Woods referred to the "extreme steepness of the side hills." Nonetheless, the Woods converted pasture to row crops and fall-plowed the soil with a moldboard plow to a depth of six to seven inches for three successive years. In 1976 and 1977 they planted the total tillable acres in corn with the rows running up and down hill, making no provisions for grassed waterways.

Plaintiffs Mosers were farmers who had always planted row crops on the contour (level) and on their other land had terraced as early as 1951 and had practiced minimum tillage since 1966.[2] When they finally gained rightful possession of this farm and saw the soil erosion that had been created by Woods' treatment of the land, they called on Roger Koster, district conservationist,[3] for assistance in developing a conservation plan for the farm.

Koster's observations, made in the fall of 1977, were from an expert's perspective. He was born and reared on a farm, graduated from Iowa State University with a Bachelor of Science Degree in Agronomy, and had postgraduate courses in soil conservation. He was a member of several professional organizations and had been employed as a soil conservationist for twenty-two years, the last thirteen years in Clayton County. Koster's qualifications classify him as an expert on soil erosion control under our definition in *Karr v. Samuelson, Inc.*, 176 N.W.2d 204, 209 (Iowa 1970).

Koster testified Woods had planted corn rows up and down hill, which doubled the erosion, and that there were no grassed waterways except in two instances. He described the rills, or small gullies, two to ten inches deep that had been cut by water runoff between the corn rows. All of this testimony was supported by photographs he had taken. Using the "universal soil loss equation,"[4] Koster computed the average soil loss for this farm for the years 1975, 1976, and 1977 at sixty-three tons per acre

1. A crop rotation is "the practice of growing different crops in succession on the same land chiefly to preserve the productive power of the soil." *Webster's Third New International Dictionary* 540 (unabr. 1976).

2. Minimum tillage, also called conservation tillage, is any tillage system that reduces the amount of soil and water runoff from the amount that would occur if clean tillage were used. *See* Soil Conservation Society of America, *Resource Conservation Glossary* 15g (1976).

3. Mr. Koster is an employee of the Soil Conservation Service, United States Department of Agriculture. *See* 16 U.S.C. § 590e (1976). He is stationed at the Clayton County Soil Conservation District, which is a creation of state law. *See* §§ 467A.5–.7, The Code. The interaction of federal and state governments within soil conservation districts is partially explained in Ferguson, *Nation-Wide Erosion Control: Soil Conservation Districts and the Power of Land-Use Regulation*, 34 Iowa L.Rev. 166, 168–70 (1949), and Comment, *Regulatory Authority to Mandate Soil Conservation in Iowa After Ortner*, 65 Iowa L.Rev. 1035, 1037 (1980).

4. The universal soil loss equation is used to design water erosion control systems. It is a mathematical equation that estimates average annual soil loss in tons per acre. Variables in the equation include rainfall intensity, soil erodibility, length of the slope, steepness of the slope, existing conservation practices, and land management factors. Soil Conservation Society of America, *Resource Conservation Glossary* 58g (1976). *See generally* W. Wischmeier & D. Smith, *Predicting Rainfall Erosion Losses—A Guide to Conservation Planning* (USDA Agri. Handbook No. 537, 1978).

per year. This loss, in his opinion, could be replaced in about fifty years if the land was withheld from cultivation and placed in good permanent pasture.

Koster also testified the maximum soil loss limitation established for Clayton County by the commissioners of the Clayton County Soil Conservation District was five tons per acre per year. *See generally Woodbury County Soil Conservation District v. Ortner*, 279 N.W.2d 276, 277 (Iowa 1979); § 467A.42(1), The Code; Comment, *Regulatory Authority to Mandate Soil Conservation in Iowa After* Ortner, 65 Iowa L.Rev. 1035, 1036 n.7, 1040 n.42 (1980). As Koster testified, these soil loss limits were promulgated by the soil conservation district to set the maximum amount of soil erosion that can be tolerated while preserving the Clayton County soil and water resources. *See* §§ 467A.42(1), 467D.1, The Code.

Although a better procedure would have been to offer a certified copy of the soil loss limit regulations, Koster worked for the district when this limit was established, employed it in his Clayton County soil conservation work, and in any event ultimately testified without objection. Because no violation of the regulation was being prosecuted in this case, the district's soil loss limits were proved well enough to establish a norm for reasonable conduct by the Woods. The Woods, as long as they claimed to be owners of the farm, had a duty to know these regulations and comply with them. § 467A.43, The Code.

Donald J. Woods testified the erosion during the Woods' possession was "nearly nil." He also testified fall plowing with a moldboard plow (which turns all the crop residue under the surface) is "a generally accepted practice." This practice, however, is so generally and publically recognized in this state as a major contributor to wind and water erosion that the court should have judicially noticed this fact and rejected this testimony. Woods' other witness was a feed salesman, without formal or practical experience in soil conservation, who testified that when in his part-time

employment he checked corn yields on the farm in 1976 he observed only "minimal" erosion.

Woods also testified they planted the corn "straight row up the hill, over the hill, and then down the hill," and that this was an "accepted practice." This testimony was controverted, of course, by Mosers and district conservationist Koster. The latter not only testified the practice was a major cause of erosion, but provided statistics that the practice was used on less than sixteen percent of the tillable land in Clayton County that needs contour farming.

There is a strong public policy that should cause courts to scrutinize carefully testimony that farming practices are "accepted" when general experience and knowledge relating to the natural effect of wind and water on exposed soil red-flag the danger of soil erosion. *See generally* Comment, *Regulatory Authority to Mandate Soil Conservation in Iowa After* Ortner, 65 Iowa L.Rev. 1035, 1035 & n.1 (1980). In *Woodbury County Soil Conservation District v. Ortner*, 279 N.W.2d at 278, we said "[t]he state has a vital interest in protecting its soil as the greatest of its natural resources, and it has a right to do so." Iowa courts have long recognized that agriculture, for which soil is a *sine qua non*, is of utmost importance in this state. *See id.* at 278 (citing *Benschoter v. Hakes*, 232 Iowa 1354, 8 N.W.2d 481 (1943)). This public policy also has been codified by Iowa's legislature in sections 467A.2, 467A.43, and 467D.1, The Code. In section 467D.1 the legislature stated:

It is hereby declared to be the policy of the state of Iowa ... to preserve and protect the public interest in the soil and water resources of this state for future generations ... and ... to mandate the conservation and proper control and use of the soil and water resources of this state, by measures including but not limited to ... the control of erosion by water or by wind ....

By legislative definition, soil and water conservation practices include strip-cropping, contour planting, and minimum tillage.

§ 467A.42(2)(b), The Code. Straight up-and-down-hill cultivation and fall-plowing cannot be classified as conservation practices and, therefore, should not be found to be "acceptable" by the finder of fact when the issue is establishing damages to hilly farmland in Iowa and the physical injury to the land is well established.

Nonetheless, trial court found that "there are two different views of soil use involved here and there is nothing to show that the method in which Defendants worked the soil was different from that employed in many other corn fields in the community or that it was contrary to principles of good husbandry." The majority "agree[s] with the trial court that Mosers failed to prove damages or the *liability* of Woods by a preponderance of the evidence." (Emphasis added.) These findings fly in the face of the overwhelming evidence. Woods should become liable for damages here because while claiming to be landowners they did not manage the farm in a reasonable manner. *See* § 467A.43, The Code. In our de novo review we should find that the farm, and consequently Mosers, sustained damages by Woods' farming procedures.

It is true that the evidence relating to the deterioration and damages to the buildings on this farm was unsatisfactory and provided no basis for arriving at a judgment in any sum. With respect to the land, the Mosers had obvious difficulties in the unusual circumstances of this case while attempting to apply the ordinary measures of damages set out in the majority opinion. Restatement (Second) of Torts section 929(1) provides four components of total damages due to a past invasion of real property. The two of interest to the immediate problem of determining damages on this farm are alternatives and are "the difference between the value of the land before the harm and the value after the harm, or at his election in an appropriate case, the cost of restoration that has been or may be reasonably incurred." Restatement (Second) of Torts § 929(1)(a) (1979). *Grell v. Lumsden*, 206 Iowa 166, 169–70, 220 N.W. 123, 125 (1928), established the following rules concerning damages to real property,

which generally comport with the Restatement (Second) section 929(1):

> Where the character of the injury is such that the premises may be reasonably restored to as good condition as they were before, the measure of recovery is the fair and reasonable cost and expense of such restoration.

> If the character of the injury is such that the property cannot be repaired or restored to its former condition at a reasonable expense, or is to the soil, . . . the measure of recovery is the difference between the value of the real property immediately before and after the injury.

(Citations omitted.) *See Oak Leaf Country Club, Inc. v. Wilson*, 257 N.W.2d 739, 747–48 (Iowa 1977) (erosion damage). Further, if a record is made that these measurements are inapplicable, the landowner may pursue other measures because our damage law is flexible enough to develop means to compensate those who have suffered an injury. Long ago this court established the following policy concerning damages to land:

> The question as to the measure of damages for a continuing injury to the land and its manner of application is one of those which arise under such an endless variety of circumstances that a rule effectuating substantial justice in one instance would often work manifest injustice in another. As a result, we find the courts making use of various rules by which, when injury has been shown, the amount of compensation may be determined. . . . The foregoing is not an exhaustive statement of th᷉ various measures of damages which have been recog-nized, but is sufficient to indicate the tendency to make the legal remedy sufficiently flexible to provide reasonably adequate compensation to the injured party.

*Harvey v. Mason City & Fort Dodge Railroad*, 129 Iowa 465, 479–80, 105 N.W. 958, 963 (1906).

The Woods produced evidence to show the farm increased in value from 1974 to the date of the hearing. The obvious explanation for this was inflation and the gener-

al increase in farm prices, conditions that, in various contexts, we have considered before. *E. g., In re Marriage of Stutsman*, 311 N.W.2d 73, 76 (Iowa 1981) (effect of inflation on cost of raising children); *Hulse v. Wifvat*, 306 N.W.2d 707, 713 (Iowa 1981) (effect of inflation on cost of providing counsel to indigents); *In re Marriage of Kehrli*, 241 N.W.2d 923, 926 (Iowa 1976) (effect of inflation on land values). Mosers were not precluded from proving damage because the farm was worth more in 1978 than in 1974.

In these circumstances, in which damages are occasioned over a period of time, and in order to factor out the elements of inflation or deflation of the value of the dollar and of real estate, an accurate measure of damages could have been developed by using our existing real property damage rules tempered slightly by concepts from the law of bailments.

> [T]he measure of damages is the difference between the value of the property immediately before, and its value immediately after, it was damaged. In adapting this rule to the bailment relationship, however, it is generally held that the measure of damages (if the property has a market value) is the difference, in the locality where it was injured, at the time of return of the property to the bailor or other termination of the bailment (which is, in legal contemplation, the time the injury occurred), between its market value in its damaged condition and such value in the condition in which it would have been but for the bailee's negligence; or, as sometimes stated, the difference at such time and place between the market value of the damaged goods and that of goods of like kind and quality in undamaged condition.

8 Am.Jur.2d *Bailments* § 334, at 1222 (1963) (footnotes omitted); *see Halferty v. Hawkeye Dodge, Inc.*, 158 N.W.2d 750, 753 (Iowa 1968); *Jones v. O'Bryon*, 254 Iowa 31, 38, 116 N.W.2d 461, 465 (1962).

Using this measure of damages, Mosers could have established that when they took possession the farm was worth less in the eroded condition than it would have been worth in an unexploited condition. The difference between the eroded and uneroded land values would be the Mosers' damages. This sum could be established through expert testimony. Of course the landowner would be qualified to express an opinion about the value of the farm at the time its possession was returned to him had it not sustained the erosion damage, and its value in its eroded condition. *See Holcomb v. Hoffschneider*, 297 N.W.2d 210, 213 (Iowa 1980); *Oak Leaf Country Club*, 257 N.W.2d at 748. Other local farmers may have qualified to express the same opinions. *See Brown v. Mostoller*, 167 Iowa 568, 581–82, 149 N.W. 908, 912–13 (1914).

Mosers attempted to demonstrate the dollar amount of damages by capitalizing a per acre decrease in productive value based on a reduction in corn suitability rating caused by the erosion. Their expert testified that this method indicated a per acre decrease in value of $62.42. Trial court evidently did not accept this estimate over defendants' objections that it was speculation and that no proper foundation had been laid for the expert testimony.

Attempting to show restoration cost, Mosers resorted to showing the cost of fill dirt, even though expert testimony indicated the soil must be replaced in the same manner it was created—by natural weathering and decaying vegetation over many years.

The majority does not question that the Woods "could have been" liable for damages caused. They were essentially trespassers, who are responsible for all injurious consequences flowing from their trespass as a natural and proximate result of their conduct. 75 Am.Jur.2d *Trespass* § 52 (1974). There is an implied covenant that even a tenant, who has an estate in the land, must farm the premises in a husband-like manner. *See Brown Land Co. v. Lehman*, 134 Iowa 712, 719, 112 N.W. 185, 188 (1907). According to our common law, a tenant is required to cultivate the farm according to the course of good husbandry and must *return* the premises in the same

general condition in which they were at the time of the letting, subject to such general deterioration as is caused by a reasonable use and lapse of time. 49 Am.Jur.2d *Landlord and Tenant* § 230, at 249, § 263 (1970). The Woods did not comply with these rules of the game.

In the case before us on de novo review, where the evidence established the extreme physical damage to the farm, I would accept Mosers' expert's computation of $62.42 per acre diminution in productive value, albeit somewhat obscure and speculative, multiplied by 185 tillable acres.

Even if this measure is rejected, there was no reason for trial court to withhold nominal damages. *See Watson v. Lewis*, 272 N.W.2d 459, 465 (Iowa 1978); *Johnson v. Scott*, 258 Iowa 1267, 1271, 142 N.W.2d 460, 463 (1966); *Harvey v. Mason City & Fort Dodge Railroad*, 129 Iowa 465, 482, 105 N.W. 958, 964 (1906) (nominal damages for injury to land).

Justice Douglas once raised the question whether the public interest should justify conferring standing upon environmental objects to sue for their own protection, pointing out that a ship has a legal personality, a fiction found useful for maritime purposes. *Sierra Club v. Morton*, 405 U.S. 727, 741–43, 92 S.Ct. 1361, 1369–70, 31 L.Ed.2d 636, 647 (1972) (Douglas, J., dissenting). Perhaps before the current and exacerbating disaster in Iowa's hill country becomes irreversible the genius of the common law will devise procedures by which an abused farm through a next friend will be accorded standing to enjoin practices like those in the record before us, and to enforce remedial measures.

I concur in all divisions of the majority opinion except division VII, to which I dissent for the reasons above stated.

McCORMICK and SCHULTZ, JJ., join this concurrence in part and dissent in part.